IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

_____
                                         )
UNITED STATES OF AMERICA,                )
                                         )
            Plaintiff,                   )
                                         )
            v.                           )          No.
                                         )
MARATHON PETROLEUM COMPANY LP, and )
CATLETTSBURG REFINING, LLC,              )
                                         )
            Defendants.                  )
                                         )
_____)

## COMPLAINT

The United States of America ("United States"), by the authority of the Attorney General and through the undersigned attorneys, acting at the request and on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), files this complaint and alleges as follows:

## NATURE OF ACTION

1.      This is a civil action against Marathon Petroleum Company LP and its wholly owned subsidiary, Catlettsburg Refining, LLC (collectively "MPC" or "Defendants"), pursuant to the following statutory provisions:  Sections 113(b) and 167 of the Clean Air Act ("CAA"), 42 U.S.C. §§ 7413(b) and 7477; Sections 109 and 113(b) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9609(c) and 9613(b); and Section 325(b)(3) of the Emergency Planning and Community Right-To-Know Act ("EPCRA"), 42 U.S.C. § 11045(b)(3).

2.      This complaint is for civil penalties and injunctive relief based on alleged

violations at all of MPC's petroleum refineries.  These refineries are located in Robinson,

Illinois; Catlettsburg, Kentucky; Garyville, Louisiana; Detroit, Michigan; Canton, Ohio; and

Texas City, Texas (the "Refineries" or "MPC's Refineries").  For purposes of this Complaint,

Illinois, Kentucky, Louisiana, Michigan, Ohio, and Texas are referred to herein as the "Relevant

States."

3.      On information and belief, the United States alleges that, at MPC's Refineries,

MPC has violated and/or continues to violate the following statutory and regulatory

requirements:

> a.      The Prevention of Significant Deterioration ("PSD") requirements found in 42 U.S.C. § 7475 and 40 C.F.R. §§ 52.21(a)(2)(iii) and 52.21(j)–52.21(r)(5);
>
> b.      The Non-Attainment New Source Review ("NNSR") requirements found in 42 U.S.C. §§ 7502(c)(5), 7503(a)–(c) and 40 C.F.R. Part 51, Appendix S, Part IV, Conditions 1–4;
>
> c.      The federally enforceable Minor New Source Review ("Minor NSR") requirements adopted and implemented by the Relevant States in their State Implementation Plans ("SIPs") pursuant to 42 U.S.C. § 7410(a)(2)(C) and 40 C.F.R. §§ 51.160–51.164;
>
> d.      The New Source Performance Standards ("NSPS") promulgated at 40 C.F.R. Part 60, Subparts A, J, VV, VVa, GGG, and GGGa pursuant to Section 111 of the CAA, 42 U.S.C. § 7411;
>
> e.      The National Emission Standards for Hazardous Air Pollutants ("NESHAPs") promulgated at 40 C.F.R. Part 63, Subparts A, CC, and UUU, pursuant to Section 112 of the CAA, 42 U.S.C. § 7412;
>
> f.      The requirements of Title V of the CAA found at 42 U.S.C. §§ 7661a(a), 7661b(c), 7661c(a), and the regulations promulgated thereunder at 40 C.F.R. §§ 70.1(b), 70.5(a) and (b), 70.6(a) and (c), and 70.7(b);
>
> g.      The portions of the Title V permits for MPC's Refineries that adopt, incorporate, or implement the provisions cited in Subparagraphs 3.a–3.e and 3.h–3.i;

h.    The federally enforceable SIPs for the Relevant States that adopt, incorporate, and/or implement the federal requirements set forth in Subparagraphs 3.a–3.b and 3.d–3.f;

i.    Additional, federally enforceable SIP regulations on a State-by-State, Refinery-by-Refinery basis, as identified in Claims 10–15 of this Complaint; and

j.    The emergency notification requirements of CERCLA, 42 U.S.C. § 9603(a), and EPCRA, 42 U.S.C. § 11004(b).

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. §§ 1331, 1345, and 1355; Sections 113(b) and 167 of the CAA, 42 U.S.C. §§ 7413(b) and 7477; Sections 109 of CERCLA, 42 U.S.C. § 9609(c); and Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3).  This Court has personal jurisdiction over MPC, which does business in the State of Michigan and in this judicial district.

5.    Venue is proper in this District pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b); 28 U.S.C. §§ 1391(b) and (c) and 1395(a); Section 113(b) of CERCLA, 42 U.S.C. § 9613(b); and Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), because some of the alleged violations in this Complaint occurred and are occurring at the Detroit Refinery which is located in this District.  Each defendant has consented to venue in this District.

## NOTICE

6.    Notice of the commencement of this action was given to Illinois, Kentucky, Louisiana, Michigan, Ohio, and Texas at least thirty (30) days prior to the filing of this complaint under Sections 113(a)(1) and 113(b) of the CAA, 42 U.S.C. §§ 7413(a)(1) and (b).

## AUTHORITY

7.     The United States Department of Justice has authority to bring this action on behalf of EPA under, *inter alia*, 28 U.S.C. §§ 516 and 519 and, for the CAA claims, also under Section 305(a) of the CAA, 42 U.S.C. § 7605(a).

## DEFENDANTS

8.     Marathon Petroleum Company LP is incorporated in the State of Delaware and does business in the Relevant States.

9.     Catlettsburg Refining, LLC is incorporated in the State of Delaware and does business in the State of Kentucky.

10.     Marathon Petroleum Company LP and Catlettsburg Refining, LLC each is a "person" within the meaning of Sections 113(b) and 302(e) of the CAA, 42 U.S.C. §§ 7413(b) and 7602(e); Section 103(a) of CERCLA, 42 U.S.C. § 9603(a); Section 329(7) of EPCRA, 42 U.S.C. § 11049(7); and applicable federal and state regulations promulgated pursuant to these statutes.

## CLEAN AIR ACT

### I.     CAA STATUTORY AND REGULATORY BACKGROUND

11.     The Clean Air Act establishes a regulatory scheme designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population.  42 U.S.C. § 7401(b)(1).

A.      **NATIONAL AMBIENT AIR QUALITY STANDARDS**

1.      **General**

12.      Section 108(a) of the CAA, 42 U.S.C. § 7408(a), requires EPA to list, and issue air quality criteria for, each air pollutant, the emissions of which may endanger public health or welfare and the presence of which results from numerous or diverse mobile or stationary sources.

13.      Section 109(a) of the CAA, 42 U.S.C. § 7409, requires EPA to promulgate regulations establishing primary and secondary national ambient air quality standards ("NAAQS") for those air pollutants for which air quality criteria have been issued pursuant to Section 108 of the CAA.  Under Section 109(b) of the CAA, 42 U.S.C. § 7409(b), the primary NAAQS are to be adequate to protect the public health with an adequate margin of safety, and the secondary NAAQS are to be adequate to protect the public welfare from any known or anticipated adverse effects associated with the presence of the air pollutant in the ambient air.

14.      Pursuant to Sections 108 and 109 of the CAA, 42 U.S.C. §§ 7408 and 7409, EPA has listed and issued air quality criteria and NAAQS for, *inter alia*, sulfur dioxide ("$SO_2$"), carbon monoxide ("CO"), and ozone.  The NAAQS for these pollutants are set forth in 40 C.F.R. Part 50.

15.      Pursuant to Section 107(d) of the CAA, 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data.  An area that meets the NAAQS for a particular pollutant is deemed an "attainment" area.  An area that does not meet the NAAQS for a particular pollutant is deemed a "non-attainment" area.  An area that cannot be classified due to insufficient data is deemed

"unclassifiable." Air quality designations for states are approved by EPA and located at 40 C.F.R. Part 81.

### 2. State Implementation Plans

16.     Section 110 of the CAA, 42 U.S.C. § 7410, requires each State to adopt and submit to EPA for approval a plan that provides for the attainment and maintenance of the NAAQS in each air quality control region within each state. This plan is known as a State Implementation Plan ("SIP").

17.     Pursuant to Section 110 of the CAA, 42 U.S.C. § 7410, the Relevant States have adopted and submitted to EPA for approval various rules for the attainment and maintenance of the NAAQS. After such provisions are approved by EPA, these provisions constitute the state's "applicable implementation plan," within the meaning of Section §§ 113(b) and 302(q) of the CAA, 42 U.S.C. §§ 7413(b) and 7602(q), and are considered the State Implementation Plan ("SIP"). These SIPs are enforceable by the respective states in which they are adopted and, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), by the United States.

18.     Of relevance to this Complaint, Section 110(a)(2)(C) of the CAA, 42 U.S.C. § 7410(a)(2)(C), requires each State Implementation Plan to include, *inter alia*, "regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program as required in parts C and D of this subchapter [Subchapter I of the CAA]."

### 3. Prevention of Significant Deterioration ("PSD") Requirements

#### a. PSD Program in General

19.     Part C of Subchapter I of the CAA, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration of air quality in those areas

designated as either attainment or unclassifiable for purposes of complying with the NAAQS. These requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources, and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision making process.  42 U.S.C. § 7470.  These provisions are referred to herein as the "PSD program."

20.     The core of the PSD program is that "[n]o major emitting facility . . . may be constructed in any [attainment or unclassifiable] area" unless various requirements are met.  42 U.S.C. § 7475(a).  These requirements include obtaining a PSD permit with emission limitations that conform to the CAA, demonstrating that emissions will not contribute to a NAAQS violation, and applying "best available control technology" ("BACT") to control emissions.  *Id.*

21.     Section 169(1) of the CAA, 42 U.S.C. § 7479(1), designates petroleum refineries which emit or have the potential to emit one hundred tons per year or more of any pollutant to be a "major emitting facility."

22.     EPA promulgated regulations to implement the PSD program.  These regulations are found at 40 C.F.R. § 52.21 and are referred to as the "PSD regulations."

### b.      PSD Programs in Michigan, Ohio, Illinois, Kentucky, Louisiana and Texas

23.     In addition to the requirement found in Section 110(a)(2)(c) of the CAA, 42 U.S.C. § 7410(a)(2)(C), Section 161 of the CAA, 42 U.S.C. § 7471, also requires that each State Implementation Plan contain a PSD program.  A state may comply with Section 161 by having EPA delegate authority to enforce the federal PSD regulations set forth at 40 C.F.R. § 52.21, or by having its own PSD regulations approved by EPA as part of its SIP.  For an "approved"

program, the state requirements must be at least as stringent as the requirements set forth at

40 C.F.R. § 51.166.

24.     The Relevant States each have either delegated or approved PSD programs.

40 C.F.R. § 52.738(b) (federal PSD program is incorporated and made part of the Illinois SIP)

(45 Fed. Reg. 52,676, Aug. 7, 1980); 401 Ky. Admin. Regs. 51:017 (approved at 63 Fed. Reg.

39,741, July 24, 1998); La. Admin. Code tit. 33, § 509 (approved at 54 Fed. Reg. 9795, March 4,

1989); Mich. Admin. Code r. 336.2801–336.2830 (approved at 75 Fed. Reg. 59,081, Sept. 27,

2010); Ohio Admin. Code 3745-31-10 through 3745-31-20 (approved at 68 Fed. Reg. 2909,

Jan. 22, 2003); 30 Tex. Admin. Code §§ 116.160–116.163 (approved at 62 Fed. Reg. 44,087,

Aug. 19, 1997).  These states are authorized to issue and enforce PSD permits.  In all respects

relevant to this Complaint, the PSD regulations of the Relevant States that are applicable to this

action closely mirror the federal PSD regulations codified at 40 C.F.R. § 52.21.

### c.     Requirements of the Applicable PSD Regulations

25.     Under the PSD regulations relevant to the allegations in this Complaint, "[n]o

new major stationary source or major modification to which the requirements of paragraphs (j)

through (r)(5) of this section [40 C.F.R. § 52.21] apply shall begin actual construction without a

permit that states that the major stationary source or major modification will meet those

requirements."  40 C.F.R. § 52.21(a)(2)(iii).  With certain exceptions not applicable here, the

requirements of paragraphs (j) through (r)(5) "apply to the construction of any new major

stationary source or the major modification of any existing major stationary source."  50 C.F.R.

§ 52.21(a)(2)(ii).

26.     "Major modification" is defined as "any physical change in or change in the

method of operation of a major stationary source that would result in:  a significant emissions

increase (as defined in paragraph (b)(40) of this section) of a regulated NSR pollutant (as defined in paragraph (b)(50) of this section) and a significant net emissions increase of that pollutant from the major stationary source."  40 C.F.R. § 52.21(b)(2)(i).

27.     "Significant emissions increase" means "for a regulated NSR pollutant, an increase in emissions that is significant (as defined in paragraph (b)(23) of this section) for that pollutant." 40 C.F.R. § 52.21(b)(40).

28.     "Regulated NSR Pollutant" means, *inter alia*, sulfur dioxide ("SO$_2$"), volatile organic compounds ("VOCs"), carbon monoxide ("CO"), and hydrogen sulfide ("H$_2$S"). 40 C.F.R. § 52.21(b)(50).

29.     "Significant" means the following amounts for the following pollutants:

| | |
|---|---|
| SO$_2$ | 40 tons per year ("TPY") |
| VOC | 40 TPY |
| CO | 100 TPY |
| H$_2$S | 10 TPY |

40 C.F.R. § 52.21(b)(23).

30.     "Net emissions increase" means "with respect to any regulated NSR pollutant emitted by a major stationary source, the amount by which the sum of the following exceeds zero:  *(a)* The increase in emissions from a particular physical change or change in the method of operation at a stationary source as calculated pursuant to paragraph (a)(2)(iv) of this section; and *(b)* Any other increases and decreases in actual emissions at the major stationary source that are contemporaneous with the particular change and are otherwise creditable."  40 C.F.R. § 52.21(b)(3)(i).

31.     If a new major stationary source or major modification triggers the requirements of the PSD Program, the owner and/or operator, *inter alia*, must install and operate the best available control technology ("BACT") (as that term is defined at 42 U.S.C. § 7479(3) and 40

C.F.R. § 52.21(b)(12)) at the facility for each pollutant that will have a significant net emissions increase, conduct air quality modeling, and analyze and demonstrate that the construction or modification, taken together with other increases or decreases of air emissions, will not violate applicable air quality standards.  42 U.S.C. § 7475(a); 40 C.F.R. §§ 52.21(j)–(r)(5).

### 4.   NonAttainment New Source Review ("NSR") Requirements

#### a.   Nonattainment New Source Review Program in General

32.   Part D of Subchapter I of the CAA, 42 U.S.C. §§ 7501-7515, sets forth provisions relating to what are commonly referred to as "New Source Review" requirements applicable to nonattainment areas ("Nonattainment NSR").  The Nonattainment NSR program is intended, *inter alia*, to reduce emissions of air pollutants in areas that have not attained the NAAQS.

33.   Part D directs states to include in their SIPs requirements to provide for reasonable progress towards attainment of the NAAQS in nonattainment areas.  42 U.S.C. § 7502(c)(2).

34.   Part D at Section 172(c)(5) of the CAA, 42 U.S.C. § 7502(c)(5), describes the core of the Nonattainment NSR Program.  Under Section 172(c)(5), all state SIPs must require permits for the construction and operation of new or modified major stationary sources anywhere in a nonattainment area within the state.  These Nonattainment NSR permits must be issued in accordance with Section 173 of the CAA, 42 U.S.C. § 7503.

35.   EPA has promulgated regulations that prescribe the elements that all state SIPs must include in their Nonattainment NSR permit programs.  40 C.F.R. § 51.165.  EPA also has issued an "Interpretative Ruling" that clarifies the requirements necessary for the approval of any permit in a nonattainment area.  40 C.F.R. Part 51, Appendix S, Part IV.

> **b.** **Nonattainment NSR Programs in Michigan, Ohio, Illinois, Kentucky, Louisiana and Texas**

36.     A state may comply with Sections 172 and 173 of the CAA by having its Nonattainment NSR regulations approved by EPA as part of its SIP.  These provisions must be at least as stringent as those set forth at 40 C.F.R. § 51.165 and must comply with 40 C.F.R. Part 51, Appendix S, Part IV.

37.     The Relevant States each have approved Nonattainment NSR permit programs. Ill. Admin. Code tit. 35, § 203 (approved at 60 Fed. Reg. 49,778, Sept. 27, 1995); 401 Ky. Admin. Regs. 51:052 (approved at 59 Fed. Reg. 32,343, June 23, 1994); La. Admin. Code tit. 33, § 504 (approved at 67 Fed. Reg. 61,260, Sept. 30, 2002); Mich. Admin. Code r. 336.1220–336.1221 (approved at 45 Fed. Reg. 29,790, May 6, 1980); Ohio Admin. Code 3745-31-21 through 3745-31-27 (approved at 68 Fed. Reg. 1366, Jan. 10, 2003); 30 Tex. Admin. Code §§ 116.150–116.151 (approved at 65 Fed. Reg. 43,986, July 17, 2000).  These states are authorized to issue and enforce Nonattainment NSR permits.  In all respects relevant to this Complaint, the Nonattainment NSR permit programs of the Relevant States that are applicable to this action closely mirror the federal regulations codified at 40 C.F.R. § 51.165 and 40 C.F.R. Part 51, Subpart S, Part IV.

> **c.** **Requirements of Applicable Nonattainment NSR Programs**

38.     Under the Nonattainment NSR requirements relevant to the allegations in this Complaint, no new major stationary source or major modification may be issued a permit to construct unless certain requirements are met.  40 C.F.R. Part 51, Appendix S, Section IV.A.

39.     "Major stationary source" includes, *inter alia*, any stationary source that has the potential to emit 100 TPY or more of any regulated NSR pollutant.  40 C.F.R. § 51.165(a)(1)(iv)(A).

11

40.     For purposes of this Complaint, "major modification" and the following terms used within that definition—"significant emissions increase," "significant," and "net emissions increase"—have the same meanings as those set forth in Paragraphs 26–27 and 29–30, except that, under the Nonattainment NSR program, there is no "significance" level for $H_2S$.  40 C.F.R. § 51.165(a)(1)(x)(A).  $H_2S$ is not a "regulated NSR pollutant" for purposes of the Nonattainment NSR program.  40 C.F.R. § 51.165(a)(1)(xxxvii).

41.     If a new major stationary source or major modification triggers the requirements of the Nonattainment NSR program, the owner and/or operator must obtain a Nonattainment NSR permit that among other things:  (a) secures federally enforceable emission offsets that are at least as great as the new or modified source's emissions; (b) installs and operates the lowest achievable emission rate ("LAER") as defined in Section 171(3) of the CAA, 42 U.S.C. § 7501(3); and (c) analyzes alternative sites, sizes, production processes, and environmental control techniques for the proposed source and demonstrate that the benefits of the proposed source significantly outweigh the environmental and social costs imposed as a result of its location, construction, or modification.  42 U.S.C. §§ 7503(a)–(c); 40 C.F.R. Part 51, Appendix S, Part IV, Conditions 1–4.

### 5.     Minor New Source Review ("Minor NSR") Requirements

#### a.     Minor NSR Program in General

42.     EPA has promulgated regulations that prescribe the elements that all state SIPs must include in the review of new sources and modifications, including modifications that do not trigger the requirements of the PSD or Nonattainment NSR programs.  40 C.F.R. §§ 51.160– 51.164.

43.     Each SIP must set forth legally enforceable procedures that enable States to determine whether construction or modification will result in: "(1) A violation of applicable portions of the control strategy [for the State]; or (2) Interference with attainment or maintenance of a national standard in the State in which the proposed source (or modification) is located or in a neighboring State."  40 C.F.R. § 51.160(a).

44.     The procedures in the SIP must include, *inter alia*, the means by which the State will prevent construction or modification if:  "(1) It will result in a violation of applicable portions of the control strategy; or (2) It will interfere with the attainment or maintenance of a national standard."  40 C.F.R. § 51.160(b).  The procedures must also provide for, *inter alia*, the submission by owners of information regarding the nature and amount of emissions to be emitted and the location, design, construction, and operation of the facility, building, structure, or installation as may be necessary to permit the State to determine whether there will be a violation of the State's control strategy or an interference with a national standard.  40 C.F.R. § 51.160(c).

45.     Each State's SIP, therefore, must include permitting requirements for not just new "major stationary sources" and "major modifications"—which fall under PSD and Nonattainment NSR regulations—but also for any construction or modification of a stationary source.  These SIP provisions generally are referred to as Minor New Source Review ("Minor NSR") programs.

>    **b.    Minor NSR Programs in Michigan, Ohio, Illinois, Kentucky, Louisiana and Texas**

46.     The Relevant States each have approved Minor NSR permit programs.  35 Ill. Admin. Code tit. 35, § 201.142 (approved at 37 Fed. Reg. 10,862, May 31, 1972); 401 Ky. Admin. Regs. 52:020 (approved at 66 Fed. Reg. 54,953 (Oct. 31, 2001)); La. Admin. Code tit. 33, § 503 (approved at 54 Fed. Reg. 9795, March 4, 1989); Mich. Admin. Code r. 336.1201–

336.1209 (approved at 45 Fed. Reg. 29,790, May 6, 1980); Ohio Admin. Code 3745-31-01

through 3745-31-09 (approved at 68 Fed. Reg. 2909, Jan, 22, 2003); and 30 Tex. Admin.

Code 116, Subpart B (approved at 60 Fed. Reg. 49,788, Sept. 27, 1995). These states are

authorized to issue and enforce Minor NSR permits.

47.    While the Relevant States' Minor NSR programs have some variation from each

other, for purposes of allegations this Complaint, the requirements and prohibitions closely

mirror each other.

### c.    Requirements of Applicable Minor NSR Programs

48.    In general, under the Minor NSR regulations relevant to the allegations in this

Complaint, a source must submit an application to the state for a permit to construct (install) any

new or modified source. *See, e.g.*, Ohio Admin. Code 3745-31-02(A) and 3745-31-04.

49.    In general, a "modification" means, *inter alia*, any physical change in, or change

in the method of operation of, any source that results in an increase in allowable emissions. *See,

e.g.*, Ohio Admin. Code 3745-31-01(QQQ) (definition of "modification").

50.    In general, "allowable emissions" means the emission rate of a source calculated

using the maximum rated capacity of the source (unless the source is subject to a federally

enforceable limit which restricts operating rates or hours of operation or both) and the most

stringent of the following:  (1) the applicable standards in 40 C.F.R. Parts 60, 61, and 63; or

(2) the applicable SIP emission limit, including those with future compliance dates; or (3) the

emissions rate in a permit that is federally enforceable, including those with a future compliance

date. *See, e.g.,* Ohio Admin. Code 3745-31-01(K) (definition of "allowable emissions").

51.    Except where the requirements of the PSD and/or Nonattainment NSR programs

apply, or unless an exemption under the state's Minor NSR rules applies, it is unlawful to operate

a new or modified source without a Minor NSR permit. *See, e.g.,* Ohio Admin.

Code 3745-31-02(A).

       **B.**    **NEW SOURCE PERFORMANCE STANDARDS**

          **1.**    **General**

52.    Section 111(b)(1)(A) of the CAA, 42 U.S.C. § 7411(b)(1)(A), requires EPA to

publish and periodically revise a list of categories of stationary sources including those

categories that, in EPA's judgment, cause or contribute significantly to air pollution which may

reasonably be anticipated to endanger public health or welfare.

53.    Once a category is included on the list, Section 111(b)(1)(B) of the CAA,

42 U.S.C. §7411(b)(1)(B), requires EPA to promulgate a federal standard of performance for

new sources within the category, also known as a New Source Performance Standard ("NSPS").

Section 111(e) of the CAA, 42 U.S.C. § 7411(e), prohibits an owner or operator of a new source

from operating that source in violation of an NSPS after the effective date of the NSPS

applicable to such source.

54.    "New source" is defined as any stationary source, the construction or modification

of which is commenced after the publication of the NSPS regulations or proposed NSPS

regulations applicable to such sources. 42 U.S.C. § 7411(a)(2). "Stationary source" is defined as

a building, structure, facility, or installation which emits or may emit any air pollutant.

42 U.S.C. § 7411(a)(3).

55.    The New Source Performance Standards are located in Part 60 of Title 40 of the

Code of Federal Regulations.

      2.      **Part 60, Subpart A:  General**

56.     Pursuant to Section 111(b)(1)(B) of the CAA, 42 U.S.C. § 7411(b)(1)(B), EPA has promulgated regulations that contain general provisions applicable to all NSPS sources. 40 C.F.R. Part 60, Subpart A, §§ 60.1- 60.19 ("Subpart A").

57.     Under Subpart A, the provisions of 40 C.F.R. Part 60 "apply to the owner or operator of any stationary source which contains an affected facility, the construction or modification of which is commenced after the publication [in Part 60] of any standard (or, if earlier, the date of publication of any proposed standard) applicable to that facility."  40 C.F.R. § 60.1.

58.     "Affected facility" is defined as "any apparatus to which a standard is applicable." 40 C.F.R. § 60.2.

      3.      **Part 60, Subpart A:  40 C.F.R. § 60.11(d)**

59.     Within Subpart A, EPA promulgated a regulation that applies at all times to all affected facilities, including associated air pollution control equipment.  Specifically, at all times, including periods of startup, shutdown, and malfunction, owners and operators shall, to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions.  40 C.F.R. § 60.11(d).

      4.      **Part 60, Subpart A:  40 C.F.R. § 60.18 (Requirements related to Flares Used as Control Devices)**

60.     Within Subpart A, EPA promulgated specific regulations that apply whenever flares are used as control devices.  40 C.F.R. §§ 60.18(b)–(f).

61.     Of relevance to this complaint are the following requirements:  flares shall be designed and operated with no visible emissions, 40 C.F.R. § 60.18(c)(1); flares shall be

operated with a flame present at all times, 40 C.F.R. § 60.18(c)(2); for steam-assisted flares, the net heating value of the gas being combusted must be 300 British Thermal Units ("BTU") per standard cubic foot ("scf") or greater, 40 C.F.R. § 60.18(c)(3)(ii); for steam-assisted flares, certain exit velocity requirements must be met, 40 C.F.R. § 60.18(c)(4); for all flares, the owner or operator must monitor the flare to ensure that it is operated and maintained in conformance with its design, 40 C.F.R. § 60.18(d); and a flare must be operated at all times when emissions are vented to it.  40 C.F.R. § 60.18(e).

### 5.    Specific NSPS Standards:  Part 60, Subparts J, VV, VVa, GGG, and GGGa

62.    Pursuant to Section 111(b)(1)(A) of the CAA, 42 U.S.C. § 7411(b)(1)(A), EPA has identified, *inter alia*, the following as categories of stationary sources that cause, or contribute significantly to, air pollution that may reasonably be anticipated to endanger public health or welfare and EPA has promulgated regulations in the following Subparts of Part 60 of Title 40 of the Code of Federal Regulations to regulate those categories:

| CATEGORY | REGULATION (40 C.F.R. Part 60) |
|---|---|
| Petroleum Refineries | Subpart J 40 C.F.R. §§ 60.100 *et seq.* |
| Equipment Leaks of VOC in Petroleum Refineries (between Jan. 4, 1983, and Nov. 7, 2006) | Subpart GGG 40 C.F.R. §§ 60.590–60.593 |
| Equipment Leaks of VOC in Petroleum Refineries (after Nov. 7, 2006) | Subpart GGGa 40 C.F.R. §§ 60.590a–60.593a |
| Equipment Leaks of VOC in the Synthetic Organic Chemicals Manufacturing Industry (between Jan. 5, 1981, and Nov. 7, 2006) | Subpart VV 40 C.F.R. §§ 60.480–60.489 |
| Equipment Leaks of VOC in the Synthetic Organic Chemicals Manufacturing Industry (after Nov. 7, 2006) | Subpart VVa 40 C.F.R. §§ 60.480a–60.489a |

63.     Of relevance to this complaint, one of the "affected facilities" that Subpart J applies to is a "fuel gas combustion device," 40 C.F.R. § 60.100(a), including a flare, 40 C.F.R. § 60.101(g), which commenced construction, reconstruction, or modification after June 11, 1973.

64.     Under Subpart J, an owner or operator of a flare that is an affected facility is prohibited from burning any fuel gas in the flare that contains $H_2S$ in excess of 230 milligrams per dry standard cubic meter (approximately 161 ppm), unless certain exceptions apply. 40 C.F.R. § 60.104(a)(1).

65.     Under Subpart J, an owner or operator of a flare that is an affected facility is required to install, calibrate, operate, and maintain an instrument for continuously monitoring and recording the concentration (dry basis) of $H_2S$ in the fuel gases before being burned in any flare.  40 C.F.R. § 60.105(a)(4).

66.     Of relevance to this complaint, the affected facilities that Subparts GGG and GGGa apply to are compressors and all "equipment" within a process unit.  40 C.F.R. §§ 60.590(a), 60.590a(a).  "Equipment" means each valve, pump, pressure relief device, sampling connection system, open-ended valve or line, and flange or other connector in VOC service.  40 C.F.R. §§ 60.591, 60.591a.

67.     In all respects relevant to this complaint, each owner or operator of a petroleum refinery that is subject to the requirements of Subparts GGG and GGGa is required to comply with the standards of Subparts VV and VVa, respectively.  40 C.F.R. §§ 60.592, 60.592a.

68.     Under Subparts VV and VVa—and therefore, under GGG and GGGa—each owner or operator who uses a flare as a control device to comply with the requirements of Subparts VV and VVa must also comply with the requirements of 40 C.F.R. § 60.18.  40 C.F.R. §§ 60.482-10(d); 60.482-10a(d).

69.     Under Subparts VV and VVa—and therefore, under GGG and GGGa—each owner or operator of any control device used to comply with the requirements of Subparts VV and VVa must monitor the control device to ensure that it is operated and maintained in conformance with its design.  40 C.F.R. §§ 60.482-10(e); 60.482-10a(e).

### C.     NATIONAL EMISSION STANDARDS FOR HAZARDOUS AIR POLLUTANTS

#### 1.     General

70.     Section 112 of the Clean Air Act sets forth a national program for the control of hazardous air pollutants ("HAPs").  42 U.S.C. § 7412.  Under Section 112(b), Congress listed 188 HAPs believed to cause adverse health or environmental effects.  42 U.S.C. § 7412(b)(1).

71.     Congress directed EPA to publish a list of all categories and subcategories of, *inter alia*, major sources of HAPs.  42 U.S.C. § 7412(c).

72.     "Major source" was and is defined as any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any HAP or 25 tons per year or more of any combination of HAPs.  42 U.S.C. § 7412(a)(1).

73.     "Stationary source" was and is defined as any building, structure, facility, or installation which emits or may emit any air pollutant.  42 U.S.C. § 7412(a)(3) (stating that "stationary source" under Section 112(a) has the same meaning as that term has under Section 111(a) of the CAA, 42 U.S.C. § 7411(a)(3)).

74.     A "category" of sources is a group of sources having some common features suggesting that they should be regulated in the same way and on the same schedule.  57 F.R. 31576, 31578 (July 16, 1992).  A single stationary source can be comprised of multiple source categories.  *Id.*

75.     Congress directed EPA to promulgate regulations establishing emission standards for each category or subcategory of, *inter alia*, major sources of HAPs.  42 U.S.C. § 7412(d)(1). These emission standards must require the maximum degree of reduction in emissions of HAPs that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for the new or existing sources in the category or subcategory to which the emission standard applies.  42 U.S.C. § 7412(d)(2).

76.     To the extent that it is not feasible to prescribe or enforce an emission standard for the control of a HAP, Congress authorized EPA to promulgate "design, equipment, work practice, or operational" standards, which are to be treated as emission standards.  42 U.S.C. § 7412(h).

77.     The emission standards promulgated under Section 112 of the 1990 Amendments of the CAA, 42 U.S.C. § 7412, are known as the National Emission Standards for Hazardous Air Pollutants ("NESHAPs") for Source Categories or "MACT" ("maximum achievable control technology") standards.  These emission standards are found in Part 63 of Title 40 of the Code of Federal Regulations.

78.     After the effective date of any emission standard, limitation, or regulation promulgated pursuant to Section 112 of the CAA, no person may operate a source in violation of such standard, limitation, or regulation.  42 U.S.C. § 7412(i)(3).

## 2.     Part 63, Subpart A:  General

79.     Pursuant to Section 112 of the CAA, 42 U.S.C. § 7412, EPA has promulgated regulations that contain general provisions applicable to sources that are subject to the MACT standards.  40 C.F.R. Part 63, Subpart A, §§ 63.1–63.16.

80.     Under Subpart A, the provisions of 40 C.F.R. Part 63 "apply to the owner or operator of any stationary source that (i) emits or has the potential to emit any hazardous air pollutant listed in or pursuant to section 112(b) of the Act; and (ii) is subject to any standard, limitation, prohibition, or other federally enforceable requirement established pursuant to this part."

81.     Under Subpart A, each relevant standard in Part 63 must identify explicitly whether each provision in Subpart A is or is not included in such relevant standard.  40 C.F.R. § 63.1(a)(4)(i).

### 3.     Part 63 Subpart A:  40 C.F.R. § 63.6(e)(1)(i)

82.     Within Subpart A of Part 63, EPA promulgated a requirement that corresponds to the "good air pollution control practices" requirement of Subpart A of the NSPS.  Specifically, at all times, including periods of startup, shutdown, and malfunction, the owner or operator must operate and maintain any affected source, including associated air pollution control equipment, in a manner consistent with safety and good air pollution control practices for minimizing emissions.  40 C.F.R. § 63.6(e)(1)(i).

### 4.     Part 63, Subpart A:  40 C.F.R. § 63.11(b) (Requirements related to Flares Used as Control Devices)

83.     Within Subpart A of Part 63, EPA promulgated specific regulations that apply whenever flares are used as control devices.  40 C.F.R. § 63.11(b).

84.     Of relevance to this complaint are the following requirements:  flares shall be designed and operated with no visible emissions, 40 C.F.R. § 63.11(b)(4); flares shall be operated with a flame present at all times, 40 C.F.R. § 63.11(b)(5); for steam-assisted flares, the net heating value of the gas being combusted must be 300 British Thermal Units ("BTU") per standard cubic foot ("scf") or greater, 40 C.F.R. § 63.11(b)(6)(ii); for steam-assisted flares,

certain exit velocity requirements must be met, 40 C.F.R. § 63.11(b)(7); the owner or operator must monitor the flare to ensure that it is operated and maintained in conformance with its design; 40 C.F.R. § 63.11(b)(1); and a flare must be operated at all times when emissions are vented to it.  40 C.F.R. § 63.11(b)(3).

### 5.      Specific MACT Standards:  Part 63, Subpart CC

85.      Pursuant to Section 112(c) of the CAA, 42 U.S.C. § 7412(c), EPA identified petroleum refineries as a source category of HAPs.  57 F.R. 31576, 31591 (Table 1) (July 16, 1992).

86.      Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), EPA promulgated the National Emission Standards for Hazardous Air Pollutants from Petroleum Refineries.  60 Fed. Reg. 43260 (August 18, 1995).  These standards are commonly referred to as the "Refinery MACT" and are found at 40 C.F.R. Part 63, Subpart CC, §§ 63.640–63.656 and associated Tables.

87.      Of relevance to this complaint, the affected sources that Subpart CC applies to are all "miscellaneous process vents" and "equipment leaks" from petroleum refining process units that are located at a plant site that is a major source and that emit or have equipment containing or contacting one or more of the HAPs listed in a table associated with Subpart CC.  40 C.F.R. §§ 63.640(c)(1), (c)(4).

88.      Under Subpart CC, owners or operators of certain types of process vents must reduce emissions of organic HAPs from these vents by using either: (1) a flare that meets the requirements of 40 C.F.R. § 63.11(b), 40 C.F.R. § 63.643(a)(1); or (2) a different type of control device that reduces organic HAPs by 98 weight percent or to a concentration of 20 ppmv. 40 C.F.R. § 63.643(a)(2).

89.     Under Subpart CC, owners and operators must comply with the equipment leak provisions of Subpart VV, 40 C.F.R. § 63.648(a), which requires compliance with 40 C.F.R. § 60.18.

90.     Pursuant to Table 6 of Subpart CC, with certain exceptions that are not applicable here, owners or operators of affected facilities under Subpart CC are required to comply with 40 C.F.R. §§ 63.6(e) and 63.11(b).

### 6.     Specific MACT Standards:  Part 63, Subpart UUU

91.     Pursuant to Section 112(d) of the CAA, 42 U.S.C. § 7412(d), and several years after promulgating Subpart CC, EPA promulgated Subpart UUU:  the "National Emission Standards for Hazardous Air Pollutants from Petroleum Refineries:  Catalytic Cracking Units, Catalytic Reforming Units, and Sulfur Recovery Units."  These standards are commonly referred to as the "Refinery MACT II" standards and are found at 40 C.F.R. Part 63, Subpart UUU, §§ 63.1560–1579 and associated Tables.

92.     Of relevance to this complaint, the affected source that Subpart UUU applies to are process vents or groups of process vents on catalytic reforming units that are associated with the regeneration of the catalyst used in the unit, 40 C.F.R. § 63.1562(b)(2), if the unit is located at a petroleum refinery that is a major source of HAP emissions. 40 C.F.R. § 63.1561(a).

93.      Under Subpart UUU, owners or operators of process vents on catalytic reforming units that are affected sources have two compliance options for controlling emissions, one of which requires venting emissions to a flare that meets the control device requirements of 40 C.F.R. § 63.11(b).  40 C.F.R. § 63.1566(a)(1)(i).

94.     Pursuant to Table 44 of Subpart UUU, owners and operators of affected facilities under Subpart UUU are required to comply with 40 C.F.R. §§ 63.6(e)(1) and 63.11(b).

23

D.     **TITLE V**

95.     Title V of the Clean Air Act, 42 U.S.C. §§ 7661–7661f, establishes an operating permit program for certain sources, including major sources, sources subject to Sections 111 (NSPS program) or 112 (NESHAP/MACT program) of the CAA, or any source required to have a PSD or Nonattainment NSR Permit.  42 U.S.C. § 7661a(a).  The purpose of Title V is to ensure that all "applicable requirements" that a source is subject to under the CAA, including SIP requirements, are collected in one permit.  42 U.S.C. § 7661c(a).

96.     Pursuant to Section 502(b) of the CAA, 42 U.S.C. § 7661a(b), EPA promulgated regulations implementing the requirements of Title V and establishing the minimum elements of a Title V permit program to be administered by any state or local air pollution control agency. 57 Fed. Reg. 32250 (July 21, 1992).  These regulations are codified at 40 C.F.R. Part 70.

97.     The Relevant States each have an EPA-approved Title V program.  Ill. Admin. Code tit. 35, § 270 (approved at 66 Fed. Reg. 62,946, Dec. 4, 2001); 401 Ky. Admin. Regs. 52:020 (approved at 66 Fed. Reg. 54,953, Oct. 31, 2001); La. Admin. Code tit. 33, § 507 (approved at 60 Fed. Reg. 47,296, Sept. 12, 1995); Mich. Admin. Code r. 336.1210 (approved at 66 Fed. Reg. 62,949, Dec. 4, 2001); Ohio Admin. Code 3745-31-77 (approved at 60 Fed. Reg. 42,045, Aug. 15, 1995); 30 Tex. Admin. Code, Chap. 122 (approved at 66 Fed. Reg. 63,318, Dec. 6, 2001).  They are authorized to issue and enforce Title V permits.  In all respects relevant to this Complaint, the Title V regulations of the Relevant States closely mirror the federal Title V regulations codified at 40 C.F.R. Part 70.

98.     Section 502(a) of the CAA (42 U.S.C. § 7661a(a)) and the Title V permit programs and regulations of the Relevant States provide that, after the effective date of the state Title V permit program, no person may violate any requirement of a Title V permit.

99.     Section 502(a) of the CAA (42 U.S.C. § 7661a(a)), the implementing regulations at 40 C.F.R. §§ 70.1(b) and 70.7(b), and the Title V permit programs and regulations of the Relevant States provide that, after the effective date of the state Title V permit program, no source subject to Title V may operate except in compliance with a Title V permit.

100.    Section 503(c) of the CAA (42 U.S.C. § 7661b(c)), the implementing regulations at 40 C.F.R. § 70.5(a), and the Title V permit programs and regulations of the Relevant States provide that each owner and operator of a source subject to Title V permitting requirements must submit a permit application.  Among other things, the permit application must contain: (i) information sufficient to determine all applicable air pollution control requirements (including any requirement to meet the applicable control technology requirements under the PSD and Nonattainment NSR programs and to comply with the applicable NSPS and/or NESHAP/MACT standards), 40 C.F.R. § 70.5(c)(4); (ii) information that may be necessary to determine the applicability of other applicable requirements of the CAA, 40 C.F.R. § 70.5(c)(5); (iii) a compliance plan for all applicable requirements for which the source is not in compliance, 42 U.S.C. § 7661b(b), 40 C.F.R. § 70.5(c)(8); and (iv) a certification of compliance with all applicable requirements by a responsible official.  40 C.F.R. § 70.5(c)(9).

101.    Under 40 C.F.R. § 70.5(b) and the Title V permit programs and regulations of the Relevant States, any applicant who fails to submit any relevant facts or who has submitted incorrect information in a permit application must, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information.

102.    Section 504(a) of the CAA (42 U.S.C. § 7661c(a)), the implementing regulations at 40 C.F.R. § 70.6(a) and (c), and the Title V permit programs and regulations of the Relevant States require each Title V permit to include, *inter alia*, enforceable emission limitations and

standards, a schedule of compliance, and such other conditions as are necessary to assure compliance with all applicable requirements of the CAA, including the requirements of the applicable SIP.

103.    All terms and conditions of a Title V permit are enforceable by EPA.  42 U.S.C. § 7413(b); 40 C.F.R. § 70.6(b).

**E.    ENFORCEMENT OF THE CAA**

104.    Sections 113(a)(1) and (a)(3) of the CAA, 42 U.S.C. §§ 7413(a)(1) and (a)(3), authorize EPA to bring a civil action under Section 113(b) if EPA finds that any person is in violation of any requirement or prohibition of a SIP, the PSD and Nonattainment NSR permit programs, a PSD or Nonattainment NSR permit, the NSPS program, the NESHAP/MACT program, the Title V permit program, or a Title V permit.

105.    Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes the Court to enjoin a violation, to require compliance, to assess and recover a civil penalty, and to award any other appropriate relief for each violation.

106.    Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes civil penalties of up to $25,000 per day for each violation of the CAA.

107.    The Civil Penalties Inflation Act of 1990, 28 U.S.C. § 2461 *et seq.*, as amended by the Debt Collection Improvements Act of 1996, 31 U.S.C. § 3701 *et seq.*, requires EPA to periodically adjust its civil penalties for inflation.  On December 31, 1996, February 13, 2004, and December 11, 2008, EPA adopted and revised regulations entitled "Adjustment of Civil Monetary Penalties for Inflation," 40 C.F.R. Part 19, to upwardly adjust the maximum civil penalty under the CAA.  For each violation that occurs between January 31, 1997, and March 15, 2004, inclusive, penalties of up to $27,500 per day may be assessed; for each violation that

occurs between March 16, 2004, and January 12, 2009, inclusive, penalties of up to $32,500 per

day may be assessed; and for each violation that occurs on and after January 13, 2009, penalties

of up to $37,500 per day may be assessed.  60 Fed. Reg. 69,360 (Dec. 31, 1996); 60 Fed. Reg.

7121 (Feb. 12, 2004); 73 F.R. 75,340 (Dec. 11, 2008).

## II.    CLEAN AIR ACT CLAIMS:  1–15

### General Allegations

108.    MPC is the "owner or operator," within the meaning of the CAA, of six petroleum

refineries located in Robinson, Illinois; Catlettsburg, Kentucky; Garyville, Louisiana; Detroit,

Michigan; Canton, Ohio; and Texas City, Texas (the "Refineries" or "MPC's Refineries").

109.    Each of MPC's Refineries is a "major emitting facility," a "source," a "stationary

source," a "major stationary source," and a "major source" within the meaning of the CAA, the

PSD, Nonattainment NSR, and Minor NSR permit programs and regulations, the NSPS program

and regulations, the NESHAP/MACT program and regulations, the Title V program and

regulations, and the state SIPs that adopt, incorporate, and/or implement these programs and

regulations.

110.    Each of MPC's Refineries has a Title V permit that has been issued by the state in

which the Refinery is located.

111.    Each of MPC's Refineries uses one or more steam-assisted flares.  A list of each

flare at MPC's Refineries is set forth in Attachment 1 to this Complaint.  These flares will be

referred to herein as "MPC's Flares" or "Flares."

112.    A flare is a combustion device that uses an uncontrolled volume of ambient air to

burn gases.

113.    A steam-assisted flare is a flare that utilizes steam piped to the flare tip to assist in combustion.

## CLEAN AIR ACT
## CLAIM 1
### Violation of PSD, Nonattainment NSR, and Corresponding State SIP Requirements at MPC's Flares

### Failure to Apply for, Obtain, and Operate Pursuant to
### PSD and/or Nonattainment NSR Permits

114.    Plaintiff realleges and incorporates by reference Paragraphs 8–10 and 108–113 as if fully set forth herein.

115.    Upon information and belief, at various times from 2003 to the present, MPC has commenced construction of a "major modification," as defined in the CAA and the Relevant States' SIPs, at each of its six Refineries.  The modifications involved physical changes in or changes in the methods of operation of the flare systems at MPC's Refineries, including physical changes in or changes in the methods of operation of the Flare subheaders within process units, Flare headers, Flare stacks, and Flare tips.

116.    Upon information and belief, these modifications resulted in a significant emissions increases of sulfur dioxide ("$SO_2$"), hydrogen sulfide ("$H_2S$"), volatile organic compounds ("VOCs"), and carbon monoxide ("CO") and a significant net emissions increase of these pollutants from MPC's Flares.

117.    MPC did not apply for, obtain, or operate pursuant to either a PSD or a Nonattainment NSR permit, as applicable, for any of these modifications.

118.    By failing to apply for, obtain, and operate pursuant to a PSD permit (where the Refinery was located in an attainment or unclassifiable area for the particular pollutant), MPC failed to:  (i) undergo a proper BACT determination for $SO_2$, $H_2S$, VOCs, and CO for the flare

systems for each Flare in connection with each major modification; (ii) install and operate BACT on the flare systems of each Flare for the control of $SO_2$, $H_2S$, VOCs, and CO; (iii) demonstrate that the emissions increases from the modifications would not cause or contribute to violations of air quality standards; (iv) provide for review and public comment on the air quality impacts of the modifications; and (v) otherwise comply with the requirements of the PSD program and the SIPs of the Relevant States.

119.    By failing to apply for, obtain, and operate pursuant to a Nonattainment NSR permit (where the Refinery was located in a nonattainment area for the particular pollutant), MPC failed to:  (i) undergo a proper LAER determination for $SO_2$, VOCs, and CO for the flare systems for each Flare in connection with each major modification; (ii) install and operate LAER on the flare systems of each Flare for the control of $SO_2$, VOCs, and CO; (iii) secure emissions reductions (offsets) from existing sources in the same area where each Refinery is located such that there would be reasonable progress toward attainment of the applicable NAAQS; and (iv) otherwise comply with the requirements of the Nonattainment NSR program and the SIPs of the Relevant States.

120.    The acts and/or omissions identified in this Claim constitute violations of:

(a)    42 U.S.C. § 7475;

(b)    40 C.F.R. §§ 52.21(a)(2)(iii) and 52.21(j)–52.21(r)(5);

(c)    42 U.S.C. §§ 7502(c)(5), 7503(a)–(c);

(d)    40 C.F.R. Part 51, Appendix S, Part IV, Conditions 1–4; and

(e)    The federally enforceable Relevant States' SIPs that adopt, incorporate, and/or implement any of the federal provisions cited in Subparagraphs 120(a)–(d).

**CLEAN AIR ACT**
**CLAIM 2**
**Violation of Minor NSR Requirements of Relevant States' SIPs at MPC's Flares**

**Failure to Apply for, Obtain, and Operate Pursuant to**
**Minor NSR Permits**

121.     Plaintiff realleges and incorporates by reference Paragraphs 8–10 and 108–113 as if fully set forth herein.

122.     Upon information and belief, at various times from 2003 to the present, MPC has commenced construction of a "modification," as defined in the Relevant States' SIPs, at each of its six Refineries.  The modifications involved physical changes in or changes in the methods of operation of flare systems at MPC's Refineries, including physical changes in or changes in the methods of operation of the Flare subheaders within process units, Flare headers, Flare stacks, and Flare tips.

123.     Upon information and belief, these modifications resulted in increases in emissions of $SO_2$, $H_2S$, VOCs, and CO that triggered Minor NSR, but these increases were not "significant emissions increases" or "significant net emissions increases" as defined in PSD and Nonattainment NSR programs and regulations.

124.     MPC did not apply for, obtain, or operate pursuant to a Minor NSR permit for any of these modifications.

125.     MPC's failure to apply for, obtain, and operate pursuant to a Minor NSR permit for these modifications prevented the Relevant States from determining whether the modifications violated the Relevant States' control strategies or interfered with attainment or maintenance of a national standard in the Relevant States or in a neighboring state.

126.    The acts and/or omissions identified in this Claim constitute violations of the

Minor NSR programs of the Relevant States as identified in Paragraph 46 of this Complaint.

**CLEAN AIR ACT**
**CLAIM 3**
**Violation of Title V and Corresponding State SIP Requirements**
**As Relate to PSD, Nonattainment NSR, and Minor NSR Requirements at MPC's Flares**

**Failure to Submit Timely and Complete Title V Permit Applications and/or**
**Supplement and Correct Previously Submitted Title V Permit Applications**
**To Incorporate PSD, Nonattainment NSR, and/or Minor NSR Requirements;**
**Operation without Valid Title V Permits Incorporating**
**PSD and/or Nonattainment NSR and/or Minor NSR  Requirements**

127.    Plaintiff realleges and incorporates by reference Paragraphs 8–10, 108–113, 115–

119, 122–124 as if fully set forth herein.

128.    Upon information and belief, as alleged in Claims 1 and 2, MPC undertook

activities constituting major modifications and/or non-major modifications at its Refineries.  For

the major modifications, these activities triggered requirements, *inter alia*, to obtain PSD and/or

Nonattainment NSR permits establishing emissions limitations that meet BACT and/or LAER at

MPC's Flares, to operate in compliance with BACT and/or LAER at MPC's Flares, and to

otherwise comply with the requirements of the PSD and/or Nonattainment NSR permit

programs.  For the non-major modifications, these activities triggered requirements that would

have enabled the Relevant States to determine if conditions or limitations on MPC's Flares

should have been imposed on the modification and/or subsequent operation.

129.    MPC failed to submit complete and timely applications for Title V operating

permits at its Refineries that:  (i) for the major modifications, included, *inter alia,* enforceable

BACT and/or LAER limits at MPC's Flares, identified all applicable requirements, accurately

certified compliance with such requirements, and contained a compliance plan for all applicable

requirements for which the Refineries were not in compliance; and (ii) for the non-major

31

modifications, included, *inter alia*, conditions or limitations that the Relevant States might have considered imposing on the Flares under the Minor NSR program.  In the alternative, MPC failed to supplement and correct previously submitted Title V permit applications in order to:  (i) for the major modifications, seek enforceable BACT and/or LAER limits at MPC's Flares, identify all applicable requirements, accurately certify compliance with such requirements, and include a compliance plan for requirements for which the Refineries were not in compliance; and (ii) for the non-major modifications, seek conditions or limitations that the Relevant States might have considered imposing on the Flares under the Minor NSR program.

130.    MPC continued and continues to operate its Refineries without having valid Title V operating permits that require compliance with BACT and/or LAER at MPC's Flares or contain a compliance plan for coming into compliance with BACT and/or LAER at MPC's Flares or contain conditions or limitations that the Relevant States might have imposed on MPC's Flares under the Minor NSR program.

131.    The acts and/or omissions identified in this Claim constitute violations of:

(a)    Title V of the CAA at 42 U.S.C. §§ 7661a(a), 7661b(c), 7661c(a);

(b)    Title V implementing regulations at 40 C.F.R. §§ 70.1(b), 70.5(a) and (b), 70.6(a) and (c), and 70.7(b); and

(c)    The federally enforceable Relevant States' Title V programs that adopt, incorporate, and/or implement any of the federal provisions cited in Subparagraphs 125(a) and (b).

**CLEAN AIR ACT**
**CLAIM 4**
**Violation of NSPS Subpart J Emission Limit, Title V Permits that Incorporate the Limit, And Corresponding State SIP Requirements**

**Failure to Comply with H$_2$S Emission Limit for Fuel Gas Sent to Flares**

132.   Plaintiff realleges and incorporates by reference Paragraphs 8–10 and 108–113 as if fully set forth herein.

133.   Each of MPC's Flares constitutes a "fuel gas combustion device" within the meaning of 40 C.F.R. § 60.100(a), and an "affected facility" within the meaning of 40 C.F.R. § 60.2.

134.   Each of MPC's Flares is subject to 40 C.F.R. Part 60, Subpart J and the requirements in each Refinery's Title V permit that compels compliance with Subpart J at the Flares.

135.   Upon information and belief, from 2003 to the present, MPC burned fuel gas in its Flares that contained H$_2$S in excess of 230 milligrams per dry standard cubic meter (approximately 161 ppm), under circumstances in which no exceptions to that standard apply.

136.   The acts and/or omissions identified in this Claim constitute violations of:

(a)   Section 111 of the CAA, 42 U.S.C. § 7411;

(b)   Section 111's implementing regulation at 40 C.F.R. § 60.104(a)(1);

(c)   Those provisions of each Refinery's Title V Permit that require compliance with 40 C.F.R. § 60.104(a)(1);

(d)   The prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and

(e)   The federally enforceable Relevant States' SIPs that adopt, incorporate, and/or implement any of the federal provisions cited in Subparagraphs 136(a)–(d).

137.    The acts and/or omissions identified in this Claim also constitute violations of

Paragraphs 17.A.i and 17.B of MPC's Petroleum Refinery Initiative Consent Decree, as amended

and revised, entered in an action styled United States, _et al_. v. Marathon Ashland Petroleum

LLC, Civ. Act. No. 4:01-CV-40119 (S.D. Mi) (hereinafter "MPC's PRI Consent Decree").

**CLEAN AIR ACT**
**CLAIM 5**
**Violation of NSPS Subpart J Monitoring Requirement, Title V Permits that Incorporate**
**Monitoring Requirement, and Corresponding State SIP Requirements**

**Failure to Install, Calibrate, Operate, and Maintain $H_2S$**
**Continuous Emissions Monitoring Systems ("CEMS") on Flares**

138.    Plaintiff realleges and incorporates by reference Paragraphs 8–10, 108–113, and

133–134 as if fully set forth herein.

139.    Upon information and belief, from 2003 to the present, at one or more of the

Flares at each of MPC's Refineries, MPC failed to install, calibrate, operate, and maintain an

instrument for continuously monitoring and recording the concentration (dry basis) of $H_2S$ in the

fuel gases before burning the fuel gas in the Flare.

140.    The acts and/or omissions identified in this Claim constitute violations of:

(a)     Section 111 of the CAA, 42 U.S.C. § 7411;

(b)     Section 111's implementing regulation at 40 C.F.R. § 60.105(a)(4);

(c)     Those provisions of each Refinery's Title V Permit that require compliance with
        40 C.F.R. § 60.105(a)(4);

(d)     The prohibitions against violating the terms of a Title V permit, which are found
        at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and

(e)     The federally enforceable Relevant States' SIPs that adopt, incorporate, and/or
        implement any of the federal provisions cited in Subparagraphs 140(a)–(d).

141.    The acts and/or omissions identified in this Claim also constitute violations of

Paragraphs 17.A.i and 17.B of MPC's PRI Consent Decree.

**CLEAN AIR ACT**
**CLAIM 6**
**Violation of Certain NSPS and NESHAP Subpart A Requirements related to Flares,**
**Title V Permits that Incorporate these Requirements,**
**and Corresponding State SIP Requirements**

**MPC's Flares:  Visible Emissions; Operation without a Flame Present;**
**Exit Velocity Violations; and Lack of Operation When Emissions are Vented**

142.    Plaintiff realleges and incorporates by reference Paragraphs 8–10, 108–113, and 133–134 as if fully set forth herein.

143.    Each of the six Refineries has "equipment" within the meaning of 40 C.F.R. §§ 60.590(a) and 60.590a(a).  This equipment is an "affected facility" within the meaning of 40 C.F.R. § 60.2.

144.    This equipment is subject to the requirements of 40 C.F.R. Part 60, Subparts GGG and GGGa and, by reference therein, to the requirements of 40 C.F.R. Part 60, Subpart VV and VVa.  This equipment also is subject to the requirements in each Refinery's Title V permit that compels compliance with 40 C.F.R. Part 60, Subparts GGG, GGGa, VV, and VVa.

145.    Each of the six Refineries has "miscellaneous process vents" and "equipment leaks" within the meaning of 40 C.F.R. § 63.640(c)(1) and (4).  These miscellaneous process vents and equipment leaks are "affected sources" within the meaning of 40 C.F.R. § 63.2.

146.    These miscellaneous process vents and equipment leaks are subject to the requirements of 40 C.F.R. Part 63, Subpart CC, and, for the equipment leaks, also are subject to the requirements of 40 C.F.R. Part 60, Subpart VV.  In addition, these miscellaneous process vents and equipment leaks are subject to the requirements in each Refineries' Title V permit that compels compliance with 40 C.F.R. Part 63, Subpart CC and 40 C.F.R. Part 60, Subpart VV.

147.    One or more of the six Refineries have "process vents or groups of process vents" on "catalytic reforming units," within the meaning of 40 C.F.R. § 63.1579.  These process vents

35

or groups of process vents on catalytic reforming units are "affected sources" within the meaning of 40 C.F.R. § 63.2

148.    These process vents or groups of process vents are subject to the requirements of 40 C.F.R. Part 63, Subpart UUU.  These process vents or groups of process vents also are subject to the requirements in each Refineries' Title V permit that compels compliance with 40 C.F.R. Part 63, Subpart UUU.

149.    On information and belief, MPC uses one or more Flares at each of its Refineries as a control device for compliance with the standards found at 40 C.F.R. Part 60, Subparts GGG, GGGa, VV, and VVa and/or at 40 C.F.R. Part 63, Subparts CC and UUU, for equipment, process vents, equipment leaks, and process vents or groups of process vents on catalytic reforming units.

150.    Each of MPC's Flares is subject to the requirements of 40 C.F.R. §§ 60.18(b)–(f) and, on information and belief, one or more of the Flares at each Refinery also is subject to 40 C.F.R. § 63.11(b).

151.    On information and belief, at various times from 2003 to the present, at one or more of the Flares at each of its Refineries, MPC did as follows:  operated the Flares with visible emissions; operated the Flares at times when no flame was present; failed to comply with maximum exit velocity requirements, and failed to operate the Flares at all times when emissions were vented to them.

152.    The acts and omissions identified in this Claim constitute violations of:

(a)     Sections 111 and 112 of the CAA, 42 U.S.C. §§ 7411, 7412;

(b)     Section 111's and 112's implementing regulations at 40 C.F.R. §§ 60.18(c)(1) and 63.11(b)(4) (prohibition on visible emissions in Subpart A of Part 60 (NSPS) and Part 63 (NESHAP/MACT));

(c)     Section 111's and 112's implementing regulations at 40 C.F.R. §§ 60.18(c)(2) and 63.11(b)(5) (flame presence requirement in Subpart A of Part 60 (NSPS) and Part 63 (NESHAP/MACT));

(d)     Section 111's and 112's implementing regulations at 40 C.F.R. §§ 60.18(c)(4) and 63.11(b)(7) (exit velocity requirements for steam-assisted flares in Subpart A of Part 60 (NSPS) and Part 63 (NESHAP/MACT));

(e)     Section 111's and 112's implementing regulations at 40 C.F.R. §§ 60.18(e) and 63.11(b)(3) (requirement to operate during emissions venting in Subpart A of Part 60 (NSPS) and Part 63 (NESHAP/MACT));

(f)     Section 111's implementing regulations at 40 C.F.R. §§ 60.592(a), 60.592a(a), 60.482-10(d), and 60.482-10a(d) (relevant provisions of NSPS's Subparts GGG, GGGa, VV and VVa), insofar as these provisions relate to flares and require compliance with 40 C.F.R. §§ 60.18(c)(1), (2), (4), and (e);

(g)     Section 112's implementing regulations at 40 C.F.R. §§ 63.643(a)(1), 63.648(a), and 63.1566(a)(1)(i) (relevant provisions of NESHAP/MACT's Subparts CC and UUU), insofar as these provisions relate to flares and require compliance with 40 C.F.R. §§ 63.11(b)(3), (4), (5) and (7);

(h)     Those provisions of each Refinery's Title V Permit that require compliance with the statutory and regulatory requirements identified in Subparagraphs 134(a)–(g);

(i)     The prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and

(j)     The federally enforceable Relevant States' SIPs that adopt, incorporate, and/or implement any of the federal provisions cited in Subparagraphs 152(a)–(i).

## CLEAN AIR ACT
## CLAIM 7
### Violation of an NSPS and NESHAP/MACT Subpart A Requirement related to Flares, Title V Permits that Incorporate this Requirement, and Corresponding State SIP Requirements

### Combusting Gas in Flares that Has a Net Heating Value of Less than 300 BTU/scf

153.    Plaintiff realleges and incorporates by reference Paragraphs 8–10, 108–113, 133–134, and 143–150 as if fully set forth herein.

154.    On information and belief, at various times from 2003 to the present, at one or more of the Flares at each of its Refineries, MPC combusted gas in the Flares that had a Net Heating Value of less than 300 BTU/scf.

155.    The acts and omissions identified in this Claim constitute violations of:

(a)    Sections 111 and 112 of the CAA, 42 U.S.C. §§ 7411, 7412;

(b)    Section 111's and 112's implementing regulations at 40 C.F.R. §§ 60.18(c)(3)(ii) and 63.11(b)(6)(ii) (BTU/scf requirement in Subpart A of Part 60 (NSPS) and Part 63 (NESHAP/MACT));

(c)    Section 111's implementing regulations at 40 C.F.R. §§ 60.592(a), 60.592a(a), 60.482-10(d), and 60.482-10a(d) (relevant provisions of NSPS's Subparts GGG, GGGa, VV and VVa), insofar as they relate to flares and require compliance with 40 C.F.R. § 60.18(c)(3)(ii);

(d)    Section 112's implementing regulations at 40 C.F.R. §§ 63.643(a)(1), 63.648(a), and 63.1566(a)(1)(i) (relevant provisions of NESHAP/MACT's Subparts CC and UUU), insofar as they relate to flares and require compliance with 40 C.F.R. § 63.11(b)(6)(ii);

(e)    Those provisions of each Refinery's Title V Permit that require compliance with the statutory and regulatory requirements identified in Subparagraphs 137(a)–(d);

(f)    The prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and

(g)    The federally enforceable Relevant States' SIPs that adopt, incorporate, and/or implement any of the federal provisions cited in Subparagraphs 155(a)–(f).

38

**CLEAN AIR ACT**
**CLAIM 8**
**Violation of an NSPS and NESHAP/MACT Subpart A Requirement related to Flares;**
**Title V Permits that Incorporate this Requirement,**
**and Corresponding State SIP Requirements**

**Failure to Operate Flares in a Manner Consistent with**
**Good Air Pollution Control Practices**

156.     Plaintiff realleges and incorporates by reference Paragraphs 8–10, 108–113, 133–134, and 143–150 as if fully set forth herein.

157.     Each of MPC's Flares is subject to 40 C.F.R. § 60.11(d) and, on information and belief, one or more of the Flares at each Refinery also is subject to 40 C.F.R. § 63.6(e)(1)(i). Under these regulations, MPC was and is required, at all times, including periods of startup, shutdown, and malfunction, to the extent practicable, to maintain and operate its flares in a manner consistent with good air pollution control practice for minimizing emissions.

158.     Good air pollution control practices for minimizing emissions at flares involve, *inter alia*, combusting essentially all molecules of hydrogen sulfide, hydrocarbons, and hazardous air pollutants ("HAPs") in the gases sent to the flares by ensuring that they have sufficient heating value and oxygen to allow for complete combustion. For steam-assisted flares (all of MPC's flares are steam-assisted), good air pollution control practices for minimizing emissions also involve, *inter alia*, injecting steam at a rate that maximizes flame stability and flare combustion efficiency.

159.     In order to ensure that the gases sent to flares have sufficient heating value to ensure complete combustion, good air pollution control practices for minimizing emissions at flares involve, *inter alia*, monitoring, measuring, and/or calculating the net heating value ("NHV") of the gases in the combustion zone ("Combustion Zone Gas") of a flare. In addition, supplemental gas must be immediately available for addition to the gas being sent to the flare

(the "Vent Gas") to ensure that the NHV of the Combustion Zone Gas is maintained at a level that ensures adequate flare combustion efficiency.

160.    In order to inject steam at a proper rate, good air pollution control practices for minimizing emissions at steam-assisted flares involve, *inter alia*, monitoring the Vent Gas flow rate and steam flow rate to the flare, calculating the ratio of the Vent Gas flow rate to the steam flow rate ("S/VG"), and having sufficient controls on the steam flow rate to enable increasing or decreasing it in order to optimize S/VG to minimize emissions.

161.    On information and belief, at various times from 2003 to the present, MPC operated its Flares without a sufficient Net Heating Value in the Combustion Zone Gas.  This insufficient NHV reduced flare combustion efficiency and resulted in emissions to the atmosphere of uncombusted hydrogen sulfide, uncombusted and partially-combusted HAPs and hydrocarbons (including VOCs), and carbon monoxide.

162.    On information and belief, at various times from 2003 to the present, MPC operated its Flares with an excessively high S/VG.  This excessively high S/VG increased the likelihood of flame quenching, reduced flare combustion efficiency, and resulted in emissions of uncombusted hydrogen sulfide, uncombusted and partially-combusted HAPs and hydrocarbons (including VOCs), and carbon monoxide.

163.    On information and belief, from 2003 to the present, at one or more of the Flares at each of its Refineries, MPC failed to install British Thermal Unit ("BTU") analyzers or other systems that would enable MPC to calculate the NHV in the Combustion Zone Gas.  In addition, MPC failed to have supplemental gas immediately available for addition to the Vent Gas.

164.    On information and belief, from 2003 to the present, at one or more of the Flares at each of its Refineries, MPC failed to install Vent Gas flow monitors and steam flow monitors;

failed to calculate S/VG; and failed to have sufficient controls on steam flow to maintain an S/VG that minimized emissions.

165.    MPC's operation of its Flares with an insufficient NHV in the Combustion Zone Gas, without a BTU analyzer or equivalent system, without supplemental gas immediately available, with excessively high steam-to-Vent-Gas ratios, without monitors to measure and calculate S/VG, and without sufficient controls on its steam to optimize the steam injection rate violated the requirement to operate the Flares in a manner consistent with good air pollution control practices for minimizing emissions.

166.    The acts and omissions identified in this Claim constitute violations of:

(a)    Sections 111 and 112 of the CAA, 42 U.S.C. §§ 7411, 7412;

(b)    Section 111's and 112's implementing regulations at 40 C.F.R. §§ 60.11(d) and 63.6(e)(1)(i) (good air pollution control practices requirement in Subpart A of Part 60 (NSPS) and Part 63 (NESHAP/MACT));

(c)    Section 112's implementing regulations at Table 6 of Subpart CC of Part 63 of Title 40 of the Code of Federal Regulations, insofar as that Table relates to flares and requires compliance with 40 C.F.R. § 63.6(e)(1)(i);

(d)    Section 112's implementing regulations at Table 44 of Subpart UUU of Part 63 of Title 40 of the Code of Federal Regulations, insofar as that Table relates to flares and requires compliance with 40 C.F.R. § 63.6(e)(1)(i);

(e)    Those provisions of each Refinery's Title V Permit that require compliance with the statutory and regulatory requirements identified in Subparagraphs 144(a)–(d);

(f)    The prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and

(g)    The federally enforceable Relevant States' SIPs that adopt, incorporate, and/or implement any of the federal provisions cited in Subparagraphs 166(a)–(f).

# CLEAN AIR ACT
## CLAIM 9
### Violation of an NSPS and NESHAP/MACT Subpart A Requirement related to Flares; Title V Permits that Incorporate this Requirement, and Corresponding State SIP Requirements

### Failure to Monitor Flares to Ensure that They Are Operated and Maintained in <u>Conformance with their Design</u>

167.    Plaintiff realleges and incorporates by reference Paragraphs 8–10, 108–113, 133–134, 143–150, 158, 160, 162, and 164 as if fully set forth herein.

168.    Each of MPC's Flares is subject to the requirements of 40 C.F.R. § 60.18(d) and, on information and belief, one or more of the Flares at each of the Refineries is subject to 40 C.F.R. § 63.11(b)(1).  Under these provisions, MPC was and is required to monitor each Flare to ensure that it is operated and maintained in conformance with its design.

169.    As part of its design, a steam-assisted flare must be operated within a range of steam-to-Vent-Gas ratios that, on the one hand, avoids smoking (through an insufficient S/VG) and, on the other hand, avoids reduced combustion efficiency (through an excessive S/VG).

170.    In order to operate a steam-assisted flare in conformance with its design, the Vent Gas flow to the flare must be monitored; the steam flow to the flare must be monitored; the ratio of the Vent Gas flow to steam flow must be calculated; and the steam flow must be subject to sufficient control to enable increasing or decreasing it in order to maintain an S/VG within design parameters.

171.    Upon information and belief, from 2003 to the present, at one or more of its Flares at each of its Refineries, MPC failed to install Vent Gas flow monitors and steam flow monitors; failed to calculate steam-to-Vent-Gas ratios; and failed to have sufficient controls on steam flow to maintain steam-to-Vent-Gas ratios within design parameters.

172.     The acts and omissions identified in this Claim constitute violations of:

(a)       Sections 111 and 112 of the CAA (42 U.S.C. §§ 7411, 7412);

(b)       Section 111's and 112's implementing regulations at 40 C.F.R. §§ 60.18(d), 63.11(b)(1);

(c)       Section 111's implementing regulations at 40 C.F.R. §§ 60.592(a), 60.592a(a), 60.482-10(d), 60.482-10a(d), 60.482-10(e), and 60.482-10a(e) (relevant provisions of NSPS's Subparts GGG, GGGa, VV and VVa) insofar as they relate to flares and require compliance with 40 C.F.R. § 60.18(d);

(d)       Section 112's implementing regulations at 40 C.F.R. §§ 63.643(a)(1), 63.648(a), and 63.1566(a)(1)(i) (relevant provisions of NESHAP/MACT's Subparts CC and UUU) insofar as they relate to flares and require compliance with 40 C.F.R. § 63.11(b)(1);

(e)       Those provisions of each Refinery's Title V Permit that require compliance with the statutory and regulatory requirements identified in Subparagraphs 172(a)–(d);

(f)       The prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and

(g)       The federally enforceable Relevant States' SIPs that adopt, incorporate, and/or implement any of the federal provisions cited in Subparagraphs 172(a)–(f).

## CLEAN AIR ACT
## CLAIM 10
## Illinois SIP

### Violation of Certain Illinois SIP Requirements Caused by Insufficient Heating Value in Combustion Zone Gas, Oversteaming, and Poor Operation of Flares at Robinson Refinery

173.     Plaintiff realleges and incorporates by reference Paragraphs 8–10 and 108–113, and 161–164 as if fully set forth herein.

174.     As part of the federally enforceable Illinois SIP, 37 Fed. Reg. 10,862 (May 31, 1972), EPA approved the following:  "No person shall cause or threaten or allow the discharge or emission of any contaminant into the environment in any State so as, either alone or in combination with contaminants from other sources, to cause or tend to cause air pollution in Illinois, or so as to violate the provisions of this Chapter ["Air Pollution:  Pollution Control

Board"], or so as to prevent the attainment or maintenance of any applicable ambient air quality standard."  Ill. Admin. Code tit. 35, § 201.141.

175.    As part of the federally enforceable Illinois SIP, 45 Fed. Reg. 11,472 (Feb. 21, 1980), EPA approved the following:  "No person shall cause or allow the emission of sulfur dioxide into the atmosphere from any process emission source to exceed 2000 ppm."  Ill. Admin. Code tit. 35, § 214.301.

176.    As part of the federally enforceable Illinois SIP, 45 Fed. Reg. 11,472 (Feb. 21, 1980), EPA approved the following:  "No person shall cause or allow the discharge of organic materials in excess of 100 ppm equivalent methane (molecular weight 16.0) into the atmosphere from [various petroleum refining sources]."  Ill. Admin. Code tit. 35, § 215.441(a).   At the same time, EPA approved a provision that allowed certain sources to comply with this general prohibition by either limiting emissions to eight (8) pounds per hour of organic material or reducing uncontrolled organic emissions by 85%.  Ill. Admin. Code tit. 35, § 215.441(c).

177.    As part of the federally enforceable Illinois SIP, 37 Fed. Reg. 10,862 (May 31, 1972), EPA approved the following:  "No person shall cause or allow the operation of an emission source which is not in compliance with the requirements of 35 Ill.  Adm. Code 215 unless such person is in compliance with a compliance program as provided for . . . in the applicable provisions of 35 Ill. Adm. Code 215."  Ill. Admin. Code tit. 35, § 201.148(a).

178.    As part of the federally enforceable Illinois SIP, 37 Fed. Reg. 10,862 (May 31, 1972), EPA approved the following:  "No person shall cause or allow the continued operation of an emission source during malfunction or breakdown of the emission source or related air pollution control equipment if such operation would cause a violation of the standards or limitations set forth in Subchapter c ["Emissions Standards and Limitations for Stationary

Sources"] of this Chapter ["Air Pollution:  Pollution Control Board"] unless the current operating permit granted by the Agency provides for operation during a malfunction or breakdown.  No person shall cause or allow violation of the standards or limitations set forth in that Subchapter during startup unless the current operating permit granted by the Agency provides for violation of such standards or limitations during startup."  Ill. Admin. Code title 35, § 201.149. Subchapter c, as referred to in this regulation, includes the regulations identified in Paragraphs 175 and 176 above.

179.    As part of the federally enforceable Illinois SIP, 37 Fed. Reg. 10,862 (May 31, 1972), EPA approved the following:  "Any person who causes or allows the continued operation of an emission source during a malfunction or breakdown of the emission source or related air pollution control equipment when such continued operation would cause a violation of the standards or limitations set forth in Subchapter c of this Chapter shall immediately report such incident to the Agency by telephone, telegraph or such other method as constitutes the fastest available alternative, except if otherwise provided in the operating permit.  Thereafter, any such person shall comply with all reasonable directives of the Agency with respect to the incident.  In addition, any person subject to this Subpart shall maintain such records and make such reports as may be required in procedures adopted by the Agency pursuant to Subpart K."  Ill. Admin. Code tit. 35, § 201.263.

180.    On information and belief, at various times from 2003 to the present, MPC operated each of the Flares at its Robinson Refinery with an insufficient NHV in the Combustion Zone Gas and an excessively high steam-to-Vent Gas ratio.  This operation increased the likelihood of flame quenching, reduced flare combustion efficiency, and resulted in emissions to the atmosphere of uncombusted hydrogen sulfide, uncombusted and partially-combusted HAPs

and hydrocarbons (including VOCs), and carbon monoxide.  On information and belief, this operation caused the discharge of organic materials in excess of 100 ppm equivalent methane (molecular weight 16.0) into the atmosphere and these emissions were not either:  (i) limited to eight (8) pounds per hour of organic material; or (ii) reduced by 85%.

181.    On information and belief, at no time between 2003 and the present did MPC have a compliance plan in place, notwithstanding the alleged violations of Ill. Admin. Code tit. 35, § 215 identified in the preceding Paragraph.

182.    On information and belief, at various times from 2003 to the present, MPC operated one or more of the Flares at its Robinson Refinery so as to emit sulfur dioxide in excess of 2000 ppm.

183.    On information and belief, at various times from 2003 to the present, MPC engaged in the acts or omissions identified in Paragraphs 180 and 182 during malfunctions and breakdowns.

184.    On information and belief, at no time did MPC provide notice or submit reports regarding the emissions that resulted from the acts and omissions described in Paragraphs 180 and 182 that occurred during malfunctions and breakdowns, nor did MPC retain records of these incidents.

185.    The acts and omissions identified in Paragraphs 180–184 of this Claim constitute violations of Ill. Admin. Code tit. 35, §§ 201.141, 201.148(a), 201.149, 201.263, 214.301, and 215.441(a) and (c); those provisions of the Robinson Refinery's Title V permit that require compliance with the SIP provisions identified in this Claim; the prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and

the provisions found in the federally enforceable Illinois Title V program that correspond to the prohibitions in 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b).

### CLEAN AIR ACT
### CLAIM 11
### Kentucky SIP

**Violation of a Kentucky SIP Requirement Caused by Insufficient Heating Value in Combustion Zone Gas, Oversteaming, and Poor Operation of Flares at Catlettsburg Refinery**

186.    Plaintiff realleges and incorporates by reference Paragraphs 8–10, 108–113, and 161–164 as if fully set forth herein.

187.    As part of the federally enforceable Kentucky SIP, 46 Fed. Reg. 40,188 (Aug. 7, 1981), EPA approved the following:  "Standard for Hydrocarbons.  The owner or operator of an affected facility shall install, operate, and maintain all equipment necessary to accomplish the following:  (1) Vacuum producing systems.  All gaseous hydrocarbons emitted from condensers, hot wells, vacuum pumps, and accumulators shall be collected and vented to a firebox, flare or other control device of equivalent efficiency as determined by the cabinet.  (2) Process unit turnaround.  The gaseous hydrocarbons purged from a process unit or vessel shall be vented to a firebox, flare, or other control device of equivalent efficiency as determined by the cabinet until the pressure in the process unit is less than five (5) psig."  401 Ky. Admin. Regs. 59:046, Sec. 3.

188.    On information and belief, MPC represented that the Flares at its Catlettsburg Refinery achieved an efficiency of 98%.

189.    On information and belief, at various times from 2003 to the present, MPC operated each of the Flares at its Catlettsburg Refinery with an insufficient NHV in the Combustion Zone Gas and an excessively high steam-to-Vent Gas ratio.  This operation increased the likelihood of flame quenching, reduced flare combustion efficiency, and resulted in

emissions to the atmosphere of uncombusted hydrogen sulfide, uncombusted and

partially-combusted HAPs and hydrocarbons (including VOCs), and carbon monoxide.

190.    On information and belief, at various times from 2003 to the present, the Flares at

MPC's Catlettsburg Refinery did not achieve 98% efficiency.

191.    The acts and omissions identified in Paragraphs 189–190 of this Claim constitute

violations of 401 Ky. Admin. Regs. 59:046, Sec. 3; those provisions of the Catlettsburg

Refinery's Title V permit that require compliance with the SIP provision identified in this Claim;

the prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C.

§ 7661a(a) and 40 C.F.R. § 70.7(b); and the provisions found in the federally enforceable

Kentucky Title V program that correspond to the prohibitions in 42 U.S.C. § 7661a(a) and 40

C.F.R. § 70.7(b).

**CLEAN AIR ACT**
**CLAIM 12**
**Louisiana SIP**

**Violation of Certain Louisiana SIP Requirements Caused by Insufficient Heating Value in
Combustion Zone Gas, Oversteaming, and Poor Operation of Flares at Garyville Refinery**

192.    Plaintiff realleges and incorporates by reference Paragraphs 8–10, 108–113, and

161–164 as if fully set forth herein.

193.    As part of the federally enforceable Louisiana SIP, 54 Fed. Reg. 9795 (March 8,

1989), EPA approved the following:  "To aid in controlling the overall levels of air contaminants

into the atmosphere, air pollution control facilities should be installed whenever practically,

economically, and technologically feasible.  When facilities have been installed on a property,

they shall be used and diligently maintained in proper working order whenever any emissions are

being made which can be controlled by the facilities, even though the ambient air quality

standards in affected areas are not exceeded."  La. Admin. Code tit. 33, § 905.

194.     As part of the federally enforceable Louisiana SIP, 76 Fed. Reg. 38,977 (July 5, 2011), EPA approved, in pertinent part, the following:  "No person shall discharge gases from the subject sources which contain concentrations of $SO_2$, which exceed 2,000 parts per million (ppm) by volume at standard conditions (three-hour average)."  La Admin. Code tit. 33, § 1503C.

195.     On information and belief, at various times from 2003 to the present, MPC operated each of the Flares at its Garyville Refinery with an insufficient NHV in the Combustion Zone Gas and an excessively high steam-to-Vent Gas ratio.  This operation increased the likelihood of flame quenching, reduced flare combustion efficiency, and resulted in emissions to the atmosphere of uncombusted hydrogen sulfide, uncombusted and partially-combusted HAPs and hydrocarbons (including VOCs), and carbon monoxide.

196.     On information and belief, at various times from 2003 to the present, MPC operated one or more of the Flares at its Garyville Refinery so as to emit sulfur dioxide in excess of 2000 ppm at standard conditions (three-hour average).

197.     The acts and omissions identified in Paragraphs 195–196 of this Claim constitute violations of La. Admin. Code tit. 33, §§ 905 and 1503C; those provisions of the Garyville Refinery's Title V permit that require compliance with the SIP provisions identified in this Claim; the prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and the provisions found in the federally enforceable Louisiana Title V program that correspond to the prohibitions in 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b).

# CLEAN AIR ACT
## CLAIM 13
### Michigan SIP

**Violation of Certain Michigan SIP Requirements Caused by Insufficient Heating Value in
Combustion Zone Gas, Oversteaming, and Poor Operation of Flares at Detroit Refinery**

198.    Plaintiff realleges and incorporates by reference Paragraphs 8–10, 108–113, and
161–164 as if fully set forth herein.

199.    As part of the federally enforceable Michigan SIP, 45 Fed. Reg. 29,790 (May 6,
1980), EPA approved, in pertinent part, the following:  "A person shall not cause or permit the
emission of an air contaminant or water vapor in quantities that cause, alone or in reaction with
other air contaminants, either of the following:  (a) Injurious effects to human health or safety,
animal life, plant life of significant economic value, or property; (b) Unreasonable interference
with the comfortable enjoyment of life and property."  Mich. Admin Code r. 336.1901.

200.    As part of the federally enforceable Michigan SIP, 45 Fed. Reg. 29,790 (May 6,
1980), EPA approved the following:  "An air-cleaning device shall be installed, maintained, and
operated in a satisfactory manner and in accordance with these [environmental] rules and
existing law."  Mich. Admin. Code r. 336.1910.

201.    As part of the federally enforceable Michigan SIP, 67 Fed. Reg. 43,548 (June 28,
2002), EPA approved, in pertinent part, the following:  "A person shall not cause or allow the
emission of volatile organic compounds from any existing source in excess of the provisions of
any rule of this part [Part 6:  Emission Limitation and Prohibitions – Existing Sources of VOC
Emissions] or the maximum allowable emission rate specified in any of the following, whichever
results in the lowest maximum allowable emission rate:  (a) A permit to install; (b) A permit to
operate; (c) A renewable operating permit issued under [the State's Title V program]; (d) A

voluntary agreement; (e) A performance contract; (f) A stipulation; (g) An order of [MDEQ]." Mich. Admin. Code r. 336.1602(1).

202.    As part of the federally enforceable Michigan SIP, 45 Fed. Reg. 29790 (May 6, 1980), EPA approved the following:  "The owner or operator of a source, process, or process equipment shall provide notice of an abnormal condition, start-up, shutdown, or a malfunction that results in emissions of a hazardous air pollutant which continue for more than 1 hour in excess of any applicable standard or limitation established by the clean air act or the emissions of a toxic air contaminant which continue for more than 1 hour in excess of an emission standard established by a rule promulgated under the air pollution act or an emission limitation specified in a permit issued or order entered under the air pollution act."  Mich. Admin. Code r. 336.1912(2).

203.    As part of the federally enforceable Michigan SIP, 45 Fed. Reg. 29,790 (May 6, 1980), EPA approved the following:  "The owner or operator of a source, process, or process equipment shall provide notice and a written report of an abnormal condition, start-up, shutdown, or a malfunction that results in emissions of any air contaminant continuing for more than 2 hours in excess of a standard or limitation established by any applicable requirement."  Mich. Admin. Code r. 336.1912(3).

204.     On information and belief, at various times from 2003 to the present, MPC operated each of the Flares at its Detroit Refinery with an insufficient NHV in the Combustion Zone Gas and an excessively high steam-to-Vent Gas ratio.  This operation increased the likelihood of flame quenching, reduced flare combustion efficiency, and resulted in emissions to the atmosphere of uncombusted hydrogen sulfide, uncombusted and partially-combusted HAPs and hydrocarbons (including VOCs), and carbon monoxide.  On information and belief, MPC's

operation of its Flares at the Detroit Refinery also resulted in excess sulfur dioxide emissions during this time period.

205.    On information and belief, the acts and omissions described in Paragraph 204 resulted in emissions of a toxic air contaminant that continued for more than 1 hour and emissions of an air contaminant that continued for more than 2 hours.

206.    On information and belief, at no time did MPC provide notice or submit reports regarding the excess emissions that resulted from the acts and omissions described in Paragraph 204.

207.    The acts and omissions identified in Paragraphs 204–206 of this Claim constitute violations of Mich. Admin. Code r. 336.1602(1), 336.1901, 336.1910, 336.1912(2), and 336.1912(3) ; those provisions of the Detroit Refinery's Title V permit that require compliance with the SIP provisions identified in this Claim; the prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and the provisions found in the federally enforceable Michigan Title V program that correspond to the prohibitions in 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b).

### CLEAN AIR ACT
### CLAIM 14
### Ohio SIP

**Violation of Certain Ohio SIP Requirements Caused by Insufficient Heating Value in Combustion Zone Gas, Oversteaming, and Poor Operation of Flares at Canton Refinery**

208.    Plaintiff realleges and incorporates by reference Paragraphs 8–10, 108–113, and 161–164 as if fully set forth herein.

209.    As part of the federally enforceable Ohio SIP, 47 Fed. Reg. 43,375 (Oct. 1, 1982), EPA approved, in relevant part, the following:  "The emission or escape into the open air from any source or sources whatsoever, of smoke, ashes, dust, dirt, grime, acids, fumes, gases, vapors,

odors, or any other substances or combinations of substances, in such manner or in such amounts as to endanger the health, safety or welfare of the public, or cause unreasonable injury or damage to property, is hereby found and declared to be a public nuisance.  It shall be unlawful for any person to cause, permit or maintain any such public nuisance."  Ohio Admin. Code 3745-15-07(A).

210.    As part of the federally enforceable Ohio SIP, 47 Fed. Reg. 43,375 (Oct. 1, 1982), EPA approved, in relevant part, the following:  "Malfunctions of air pollution control equipment shall be reported as follows:  "(1) In the event that any emission source, air pollution control equipment, or related facility breaks down in such a manner as to cause the emission of air contaminants in violation of any applicable law, the person responsible for such equipment shall immediately notify the Ohio environmental protection agency district office or delegate agency of such failure or breakdown.  If the malfunction continues for more than seventy-two hours, the source owner or operator shall provide a written statement to the director within two weeks of the date the malfunction occurred.  The immediate notification and written statement shall include the following data:  [data omitted]. (2) The Ohio environmental protection agency district office or delegate agency shall be notified when the condition causing the failure or breakdown has been corrected and the equipment is again in operation.  Notification of the correction of the condition causing the failure or breakdown may be given verbally if the duration of the malfunction is seventy-two hours or less.  Otherwise, such notification shall be in writing.  (3) Within two months following a failure or breakdown which exceeded seventy-two hours in duration, the owner or operator of such equipment shall prepare and submit a detailed report which identifies a program to prevent, detect and correct, as expeditiously as practicable, similar future failures or breakdowns of such equipment."  Ohio Admin. Code 3745-15-06(B).

211.    On information and belief, at various times from 2003 to the present, MPC operated each of the Flares at its Canton Refinery with an insufficient NHV in the Combustion Zone Gas and an excessively high steam-to-Vent Gas ratio.  This operation increased the likelihood of flame quenching, reduced flare combustion efficiency, and resulted in emissions to the atmosphere of uncombusted hydrogen sulfide, uncombusted and partially-combusted HAPs and hydrocarbons (including VOCs) and carbon monoxide.  On information and belief, MPC's operation of the Flares at its Canton Refinery also resulted in excess sulfur dioxide emissions during this time period.

212.    On information and belief, at various times from 2003 to the present, MPC engaged in the acts or omissions identified in Paragraph 211 during malfunctions and breakdowns.

213.    On information and belief, at no time did MPC provide notice or written statements or submit reports regarding the acts and omissions described in Paragraph 211.

214.    The acts and omissions identified in Paragraph 211–213 of this Claim constitute violations of Ohio Admin. Code 3745-15-07(A) and 3745-15-06(B); those provisions of the Canton Refinery's Title V permit that require compliance with the SIP provisions identified in this Claim; the prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and the provisions found in the federally enforceable Ohio Title V program that correspond to the prohibitions in 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b).

**CLEAN AIR ACT**
**CLAIM 15**
**Texas SIP**

**Violation of Certain Texas SIP Requirements Caused by Insufficient Heating Value in Combustion Zone Gas, Oversteaming, and Poor Operation of Flares at Texas City Refinery**

215.    Plaintiff realleges and incorporates by reference Paragraphs 8–10, 108–113, and 161–164 as if fully set forth herein.

216.    As part of the federally enforceable Texas SIP, 37 Fed. Reg. 10,895 (May 31, 1972), EPA approved the following:  "No person shall discharge from any source whatsoever one or more air contaminants or combinations thereof, in such concentration and of such duration as are or may tend to be injurious to or to adversely affect human health or welfare, animal life, vegetation, or property, or as to interfere with the normal use and enjoyment of animal life, vegetation, or property."  30 Texas Admin. Code § 101.4.

217.    As part of the federally enforceable Texas SIP, 75 Fed. Reg. 68,989 (Nov. 10, 2010), EPA approved, in relevant part, the following:  "All pollution emission capture equipment and abatement equipment must be maintained in good working order and operated properly during facility operations."  30 Texas Admin. Code § 101.221(a).

218.    As part of the federally enforceable Texas SIP, 71 Fed. Reg. 52,656 (Sept. 6, 2006), EPA approved, in relevant part, the following:  "HRVOC [Highly-Reactive Volatile Organic Compound] emissions at each site located in the Houston/Galveston/Brazoria area . . . must not exceed 1,200 pounds of HRVOC per one-hour block period from any flare, vent, pressure relief valve, cooling tower, or any combination."  30 Texas Admin. Code § 115.722(c)(2).

219.    As part of the federally enforceable Texas SIP, 75 Fed. Reg. 68,989 (Nov. 10, 2010), EPA approved a provision that requires owners and operators to undertake a series of

actions related to emissions events when the reportable quantity (as defined earlier in the Texas regulations) of pollutants is exceeded.  30 Texas Admin. Code § 101.201.  These requirements include but are not limited to:  (1) determining if a reportable emissions event occurred; (2) notifying the Texas Commission on Environmental Quality ("TCEQ") within 24-hours of a reportable emissions event, including providing a list of specific information relating to the event; (3) creating, and retaining for five years, a final record of all reportable and non-reportable emissions events by no later than two weeks after the end of the emissions event, including retaining a list of specific information related to the event; (4) performing, if requested by TCEQ, a technical evaluation of the emissions event; and (5) submitting to TCEQ an annual emissions event report, including providing the total number of reportable and non-reportable emissions events and estimating the total quantities of air contaminants that were emitted during the emissions events.  30 Texas Admin. Code § 101.201.

220.     As part of the federally enforceable Texas SIP, 75 Fed. Reg. 68989 (Nov. 10, 2010), EPA approved a provision which requires owners or operators to provide notice to the TCEQ at least ten days, or as soon as practicable, prior to any scheduled maintenance, startup, or shutdown activity that is expected to cause an unauthorized emission that equals or exceed the reportable quantity [as defined in an earlier regulation] in any 24-hour period.  30 Texas Admin. Code § 101.211(a).  The notice must include a specific list of information.  30 Texas Admin. Code § 101.211(a)(1)(A)–(K).  In addition, the owner or operator must create, and retain for five years, a record of such activities by no later than two weeks after the end of each scheduled activity.  30 Texas Admin. Code § 101.211(b).  The records must include a specific list of information.  30 Texas Admin. Code § 101.211(b)(1)(A)–(K).

221.    As part of the federally enforceable Texas SIP, 75 Fed. Reg. 68,989 (Nov. 10, 2010), EPA approved a provision which gives the owner or operator of a source the ability to assert an affirmative defense to enforcement actions brought for:

(a)    Upset events if the owner or operator proves the existence of eleven specific criteria set forth in the provision (30 Texas Admin. Code § 101.122(b));

(b)    Unplanned maintenance, startup, or shutdown activities if the owner or operator proves the emissions were from an unplanned maintenance, startup, or shutdown activity and also proves the existence of nine specific criteria set forth in the provision (30 Texas Admin. Code § 101.122(c); or

(c)    Planned maintenance, startup, or shutdown activities if the owner or operator proves the existence of nine specific conditions set forth in the provision (30 Texas Admin. Code § 101.122(h)).

222.    On information and belief, at various times from 2003 to the present, MPC operated each of the Flares at its Texas City Refinery with an insufficient NHV in the Combustion Zone Gas and an excessively high steam-to-Vent Gas ratio.  This operation increased the likelihood of flame quenching, reduced flare combustion efficiency, and resulted in emissions to the atmosphere of uncombusted hydrogen sulfide, uncombusted and partially-combusted HAPs and hydrocarbons (including VOCs), and carbon monoxide.  On information and belief, MPC's operation of its Flares at the Texas City Refinery also resulted in excess sulfur dioxide emissions during this time period.

223.    On information and belief, at various times from 2003 to the present, the flare operation described in Paragraph 222 resulted in HRVOC emissions from one or more of the Flares at the Texas City Refinery in excess of 1200 pounds per one-hour block period.

224.    On information and belief, at various times from 2003 to the present, the acts and omissions identified in Paragraph 222 resulted in the exceedance of the reportable quantity of

numerous pollutants, including but not limited to, sulfur dioxide, hydrogen sulfide, CO, VOCs, and HRVOCs.

225.    On information and belief, at various times from 2003 to the present, MPC engaged in the acts or omissions identified in Paragraph 222 during all of the following periods: scheduled or planned maintenance, startup, and/or shutdown; unplanned maintenance, startup, and/or shutdown; and upset events.

226.    On information and belief, MPC did not satisfy the criteria required to assert an affirmative defense to the emissions resulting from the acts and omissions identified in Paragraph 222.

227.    On information and belief, at no time did MPC submit to TCEQ any notifications or any initial, final, or annual reports as a result of the emissions resulting from the acts or omissions identified in Paragraph 222.  On information and belief, at no time did MPC create any records relating to the emissions resulting from the acts or omissions identified in Paragraph 222.

228.    The acts and omissions identified in Paragraph 222 of this Claim constitute violations 30 Texas Admin Code §§ 101.4, 101.221(a), 115.722(c)(2), 101.201, and 101.211(a) and (b) ; those provisions of the Texas City Refinery's Title V permit that require compliance with the SIP provisions identified in this Claim; the prohibitions against violating the terms of a Title V permit, which are found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b); and the provisions found in the federally enforceable Texas Title V program that correspond to the prohibitions in 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b).

III.    **CLEAN AIR ACT:  REQUEST FOR RELIEF**

229.    For the violations asserted in Claims 1 through 15, pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and the Civil Penalties Inflation Act of 1990, MPC is subject to injunctive relief, mitigation of the effects of excess emissions, and civil penalties of up to $27,500 per day for each violation between January 31, 1997, and March 15, 2004; up to $32,500 per day for each violation between March 16, 2004, and January 12, 2009; and up to $37,500 per day for each violation after January 12, 2009.

*   *   *   *

**COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT ("CERCLA") AND EMERGENCY PLANNING AND COMMUNITY RIGHT-TO-KNOW ACT ("EPCRA")**

IV.    **CERCLA/EPCRA:  STATUTORY AND REGULATORY BACKGROUND**

A.    **CERCLA Emergency Notification Requirements**

230.    Section 102(a) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9602(a), requires the Administrator of EPA to publish a list of substances designated as hazardous substances which when released into the environment may present substantial danger to public health or welfare or the environment, and to promulgate regulations establishing that quantity of any hazardous substance, the release of which shall be required to be reported under Section 103(a) of CERCLA, 42 U.S.C. § 9603(a) ("Reportable Quantity" or "RQ").  The list of RQs of hazardous substances is codified at 40 C.F.R. Part 302.

231.    Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), as implemented by 40 C.F.R. Part 302, requires, in relevant part, that a person in charge of an onshore facility, as soon as he/she has knowledge of a release (other than a federally permitted release) of a hazardous

substance from such facility in quantities equal to or greater than the RQ to immediately notify the National Response Center ("NRC") established under the Section 311(d)(2)(E) of the CWA, 33 U.S.C. § 1321(d)(2)(E), of such release.

232.    "Onshore facility," under Section 101 of CERCLA, 42 U.S.C. § 9601, is defined as any facility of any kind located in, on, or under, any land or nonnavigable waters within the United States.  42 U.S.C. § 9601(18).

233.    Section 109(c)(1) of CERCLA, 42 U.S.C. § 9609(c)(1), provides that any person who violates the notice requirements of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), shall be liable to the United States for civil penalties.

## B.    EPCRA Emergency Notification Requirements

234.    The Emergency Planning and Community Right-to-Know Act ("EPCRA") was enacted on October 17, 1986, as Title III of the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 (1986) (codified at 42 U.S.C. §§ 11001–11050).

235.    The purpose of EPCRA was and is to provide communities with information on potential chemical hazards within their boundaries and to foster state and local emergency planning efforts to control any accidental releases.  Emergency Planning and Community Right-to-Know Programs, Interim Final Rule, 51 Fed. Reg. 41,570 (1986).

236.    To achieve this end, EPCRA mandates that state emergency response commissions ("SERCs") and local emergency planning committees ("LEPCs") be created. 42 U.S.C. § 11001(a) and (c).  EPCRA establishes a framework of state, regional, and local agencies designed to inform the public about the presence of hazardous and toxic chemicals, and to provide for emergency response in the event of a health-threatening release.  42 U.S.C. § 11001.  EPCRA further mandates that industrial and commercial facilities, at which a

hazardous chemical is produced, used, or stored, notify SERCs and LEPCs when they have releases of extremely hazardous substances and hazardous substances.  42 U.S.C. § 11004.

237.   Sections 304(a) and (b) of EPCRA, 42 U.S.C. §§ 11004(a) and (b), requires the owner and operator of a facility at which a hazardous chemical is produced, used, or stored, to immediately notify the SERC and LEPC of certain specified releases of a hazardous or extremely hazardous substance.

238.   Section 329(4) of EPCRA, 42 U.S.C. § 11049(4), and 40 C.F.R. § 355.20 define "facility" to mean, in relevant part, all buildings, equipment, structures, and other stationary items which are located on a single site and that are owned or operated by the same person.

239.   Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), provides that any person who violates the notice requirements of Section 304 of EPCRA, 42 U.S.C. § 11004, shall be liable to the United States for civil penalties.

C.   **Federal Enforcement of CERCLA and EPRCA Emergency Notification Requirements**

240.   Section 109(c) of CERCLA, 42 U.S.C. § 9609(c), and Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), authorize EPA to assess a civil penalty of up to $25,000 per day of violation, and in the case of a second or subsequent violation, $75,000 per day of violation of CERCLA Section 103, 42 U.S.C. § 9603, or of EPCRA Section 304, 42 U.S.C. § 11004.  The Debt Collection Improvement Act, 31 U.S.C. § 3701 *et seq.*, requires EPA to periodically adjust its civil penalties for inflation.  On December 31, 1996, February 13, 2004, and December 11, 2008, EPA adopted and revised regulations entitled "Adjustment of Civil Monetary Penalties for Inflation," 40 C.F.R. Part 19, to upwardly adjust the maximum civil penalty under CERCLA and EPCRA.  For each violation that occurs between January 31, 1997, and March 15, 2004, inclusive, penalties of up to $27,500 per day may be assessed; for each violation that occurs

between March 16, 2004, and January 12, 2009, inclusive, penalties of up to $32,500 per day

may be assessed; and for each violation that occurs on and after January 13, 2009, penalties of up

to $37,500 per day may be assessed.  Additionally, in the case of a second or subsequent

violation, for each violation that occurs between January 31, 1997, and March 15, 2004,

inclusive, penalties of up to $82,500 per day may be assessed; for each violation that occurs

between March 16, 2004, and January 12, 2009, inclusive, penalties of up to $97,500 per day

may be assessed; and for each violation that occurs on and after January 13, 2009, penalties of up

to $107,500 per day may be assessed.  61 Fed. Reg. 69,360 (Dec. 31, 1996); 69 Fed. Reg. 7121

(Feb. 12, 2004); 73 Fed. Reg. 75,340 (Dec. 11, 2008).

## V.   CERCLA AND EPCRA EMERGENCY NOTIFICATION CLAIMS

### General Allegations

241.    Each of MPC's Refineries is an "onshore facility," within the meaning of

Section 103(a) of CERCLA, 42 U.S.C.  § 9603(a), and a "facility" within the meaning of

Section 329(4) of EPCRA, 42 U.S.C. § 11049(4).   MPC was and is "in charge of" these

facilities as that phrase is used in Section 103 of CERCLA, 42 U.S.C. § 9603(a), and was and is

the "owner or operator" of these facilities as that phrase is used in Section 304 of EPCRA,

42 U.S.C. § 11004.

242.    Hazardous substances have been deposited, stored, disposed of, placed, or

otherwise come to be located at MPC's Refineries, 42 U.S.C. § 9601(9), and hazardous

chemicals are produced, used, or stored at MPC's Refineries.  42 U.S.C. § 11004(a).

243.    Hydrogen sulfide, hydrofluoric acid, and anhydrous ammonia each is a

"hazardous substance" for purposes of CERCLA and EPRCA emergency notification

requirements.  42 U.S.C. § 9601(14); 42 U.S.C. §§ 11004(a),(b); 40 C.F.R. § 302.4 at

Table 302.4; 40 C.F.R. Part 355, Appendix A.  The reportable quantity of hydrogen sulfide,

hydrofluoric acid, and anhydrous ammonia is 100 pounds, each, as listed in 40 C.F.R. § 302.4,

Table 302.4 and 40 C.F.R. Part 355, Appendix  A.

244.    Sulfur dioxide is an "extremely hazardous substance" for purposes of EPCRA

emergency notification requirements.  42 U.S.C. §§ 11004(a),(b); 40 C.F.R. Part 355,

Appendix A.  The reportable quantity of sulfur dioxide is 500 pounds, as listed at 40 C.F.R.

Part 355, Appendix A.

<strong>CERCLA and EPCRA<br>CLAIM 16<br>Violation of CERCLA and EPCRA Emergency Notification Requirements</strong>

<strong>Failure to Notify National Response Center, Applicable SERCs, and/or Applicable LEPCs of Releases of Sulfur Dioxide and Hydrogen Sulfide in Excess of the Reportable Quantity Based on Insufficient Heating Value in Combustion Zone Gas and Oversteaming of Flares at All MPC Refineries</strong>

245.    Plaintiff realleges and incorporates by reference Paragraphs 8–10, 161–164, and

241–244 as if fully set forth herein.

246.    On information and belief, on numerous occasions from 2003 to the present, the

acts and omissions alleged in Paragraphs 161–164 resulted in releases of hydrogen sulfide and

sulfur dioxide in excess of the reportable quantity of those substances.

247.    The releases were not "federally permitted releases" as that term is used in

Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), and 40 C.F.R. § 302.6, and defined in

Section 101(10) of CERCLA, 42 U.S.C. § 9601(10).

248.    MPC failed to immediately notify the National Response Center of the releases of

hydrogen sulfide identified in Paragraph 246 as soon as it had knowledge of the releases within

the meaning of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a).

249. MPC failed to immediately notify the applicable SERCs and LEPCs of the releases of hydrogen sulfide and sulfur dioxide identified in Paragraph 246 as soon as it had knowledge of the releases within the meaning of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a).

250. The acts and omissions identified in this Claim constitute violations of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a); its implementing regulation at 40 C.F.R. § 302.6(a); Sections 304(a) and (b) of EPCRA, 42 U.S.C. §§ 11004(a) and (b); and their implementing regulation at 40 C.F.R. 355.40(b).

**CERCLA and EPCRA**
**CLAIM 17**
**Violation of CERCLA and EPCRA Emergency Notification Requirements**

**Failure to Notify the NRC, Applicable SERCs, and/or Applicable LEPCs of Releases
At the Canton, Detroit and Robinson Refineries**

251. Plaintiff realleges and incorporates by reference Paragraphs 8–10 and 241–244 as if fully set forth herein.

252. On February 23, 2011, there was a release of hydrofluoric acid in excess of the reportable quantity at the Canton Refinery.

253. On each day between February 26, 2010, and May 27, 2010, there was a release of anhydrous ammonia in excess of the reportable quantity at the Detroit Refinery.

254. On the following days, there were releases of sulfur dioxide in excess of the reportable quantity at the Robinson Refinery: January 6, 2008; April 30, 2008; June 6, 2008; June 12, 2008; September 4, 2008; December 21, 2008; December 25, 2008; March 18, 2009; April 20, 2009; each day between December 11, 2009, January 4, 2010; and August 3, 2010.

255.    The releases identified in Paragraphs 252–254 were not "federally permitted releases" as that term is used in Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), and 40 C.F.R. § 302.6, and defined in Section 101(10) of CERCLA, 42 U.S.C. § 9601(10).

256.    MPC failed to immediately notify the National Response Center of the releases of hydrofluoric acid and anhydrous ammonia identified in Paragraphs 252 and 253 as soon as it had knowledge of the releases within the meaning of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a).

257.    MPC failed to immediately notify the applicable SERC and LEPC of the releases of hydrofluoric acid, anhydrous ammonia, and sulfur dioxide identified in Paragraphs 252–254 as soon as it had knowledge of the releases within the meaning of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a).

258.    The acts and omissions identified in this Claim constitute violations of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a); its implementing regulation at 40 C.F.R. § 302.6(a); Sections 304(a) and (b) of EPCRA, 42 U.S.C. §§ 11004(a) and (b); and their implementing regulation at 40 C.F.R. 355.40(b).

## VI.    CERCLA/EPCRA:  REQUEST FOR RELIEF

259.    For the violations asserted in Claims 16 and 17, pursuant to Section 109(c)(1) of CERCLA, 42 U.S.C. § 9609(c)(1), Section 325(b)(3) of EPCRA, 42 U.S.C. § 11045(b)(3), and the Federal Civil Penalties Inflation Adjustment Act of 1990, MPC is subject to civil penalties of up to $32,500 per day for each violation between March 16, 2004, and January 12, 2009, and up to $37,500 per day for each violation on and after January 13, 2009.  Additionally, in the case of a second or subsequent violation, MPC is subject to a civil penalty of up to $97,500 per day for

each violation between March 16, 2004, and January 12, 2009, and up to $107,500 per day for each violation on and after January 13, 2009.

*   *   *   *

<b><u>PRAYER FOR RELIEF</u></b>

WHEREFORE, based upon the allegations in Paragraphs 1–259 of this Complaint, the United States requests that this Court:

1.      Permanently enjoin MPC from operating its Refineries except in accordance with the CAA and all applicable federal regulations and applicable federally enforceable state regulations;

2.      Order MPC to operate its Refineries in compliance with the CAA statutory and regulatory requirements set forth herein, the applicable SIP requirements, and the PSD, Nonattainment NSR, Minor NSR, and Title V permits applicable to each Refinery;

3.      Order MPC to take other appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the CAA alleged herein;

4.      Assess a civil penalty against MPC of up to $27,500 per day for each violation of the CAA occurring between January 31, 1997, and March 15, 2004; up to $32,500 for each violation of the CAA, CERCLA, and EPCRA occurring between March 16, 2004, and January 12, 2009; and up to $37,500 per day for each violation occurring on and after January 13, 2009.  Additionally, in the case of a second or subsequent violation of CERCLA and EPCRA, assess a civil penalty against MPC of up to $97,500 per day for each violation between March 16, 2004, and January 12, 2009, and up to $107,500 per day for each violation on and after January 13, 2009;

5.      Award Plaintiff its costs of this action; and

6.      Grant such other relief as the Court deems just and proper.

Respectfully Submitted,


s/ with consent of Ignacia S. Moreno
IGNACIA S. MORENO
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice



s/ Annette M. Lang
ANNETTE M. LANG
Environmental Enforcement Section
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-4213
(202) 616-6584 (fax)
annette.lang@usdoj.gov



BARBARA L. MCQUADE
United States Attorney
Eastern District of Michigan



By:     s/ with consent of Ellen Christensen
ELLEN CHRISTENSEN
Assistant United States Attorney
Eastern District of Michigan
211 W. Fort St., Suite 2001
Detroit, MI  48226
(313) 226-9784
ellen.christensen@usdoj.gov

OF COUNSEL:

ROBERT PARRISH
Attorney-Adviser
Office of Enforcement and Compliance Assurance
Air Enforcement Division
United States Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Room 2109B
Washington, DC  20460-0001

# ATTACHMENT 1

## FLARES AT MPC'S REFINERIES AS OF DATE OF LODGING

Canton, Ohio Refinery

     Canton North (04-14-B-001)
     Canton South (04-14-B-002)

Catlettsburg, Kentucky Refinery

     New North Area (2-11-FS-2)
     HF Alkylation (2-11-FS-3)
     FCCU (2-11-FS-4)
     Lube Petrochem (1-14-FS-3)
     Pitch (1-14-FS-1)

Detroit, Michigan Refinery

     Crude (04FS-1)
     Unifier (07FS-1)
     Alkylation (09FS-1)
     CP (25FS-1)

Garyville, Louisiana Refinery

     Garyville North (69-74)
     Garyville South (83-74)
     GME North (259-1401)
     GME South (259-1402)

Robinson, Illinois Refinery

     84-F1
     84-F5
     84-F6
     84-F2
     84-F3
     84-F4

Texas City, Texas

     Main (84FL-001)
     HF Alkylation (84FL-002)